**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PIONEER ENERGY SERVICES CORP., *et al.*,[1] | Case No. 20-31425 (DRJ) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF LORNE PHILLIPS IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Lorne Phillips, do hereby declare, under penalty of perjury, that:

1.      I serve as the Executive Vice President and Chief Financial Officer of Pioneer Energy Services Corp. ("Pioneer Energy") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors" and, together with their non-debtor subsidiaries and affiliates, "Pioneer" or the "Company").  Pioneer is a publicly held company organized under the laws of the state of Texas.  I have served in my current capacities since February 2009 when I commenced employment with the Company.

2.      Before joining Pioneer, I was employed by Cameron International Corp. where I served as the vice president and treasurer and, prior to that, as the general manager of Cameron International Corp.'s Canadian valves operations, vice president of marketing and M&A for the valves division and business development manager.  I have over 24 years of corporate finance and

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are as follows:  Pioneer Energy Services Corp. (8619); Pioneer Coiled Tubing Services, LLC (6232); Pioneer Drilling Services, Ltd. (2497); Pioneer Fishing & Rental Services, LLC (4399); Pioneer Global Holdings, Inc. (4707); Pioneer Production Services, Inc. (1361); Pioneer Services Holdings, LLC (4706); Pioneer Well Services, LLC (7572); Pioneer Wireline Services Holdings, Inc. (6455); and Pioneer Wireline Services, LLC (2205).  The headquarters for the above-captioned Debtors is 1250 N.E. Loop 410, Suite 1000, San Antonio, Texas 78209.

financial reporting experience, with a particular focus on the oil services industry. I hold an M.B.A. from Harvard University.

3.      As Executive Vice President and Chief Financial Officer, I am responsible for, among other things, overseeing the operations and financial activities of the Debtors, including, but not limited to, monitoring cash flow, business relationships, workforce issues and financial planning. In this capacity, I have been extensively involved in the events leading up to the commencement of the chapter 11 cases by the Debtors (the "Chapter 11 Cases"). I have detailed knowledge of, and experience with, the business and financial affairs of the Debtors and the industry in which they operate.

4.      On March 1, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition seeking relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). As described below, the Chapter 11 Cases have been commenced to implement a consensual financial restructuring with the support of substantially all of the Company's secured lenders and more than 75% of the Company's unsecured noteholders.

5.      I submit this declaration in support of the chapter 11 petitions (the "Petitions") and the relief requested by the Debtors in various motions and applications (collectively, the "First Day Motions") filed contemporaneously herewith, and to provide an overview of the Debtors and their current circumstances. I have reviewed the Petitions and the First Day Motions and believe that the relief sought therein is essential to ensure that the Debtors' business continues to operate in the ordinary course during the pendency of these Chapter 11 Cases.

6.      Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees with responsibility for the relevant business and corporate matters addressed in the First

Day Motions, or my opinion based upon experience, knowledge and information concerning the Debtors and the industry in which they operate.  I am authorized to submit this declaration on behalf of each Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

7.     Section I of this declaration provides an overview of the Chapter 11 Cases.  Section II provides background information on the Company's businesses, corporate structure, history and current indebtedness, as well as the Chapter 11 Cases.  Section III describes the Company's prepetition restructuring efforts and the events leading up to the filing of the Chapter 11 Cases.  Finally, Section IV sets forth relevant facts in support of the First Day Motions.

## I.     <u>Overview</u>

8.     Pioneer provides land-based drilling services and production services to a diverse group of oil and gas exploration and production companies in the United States and internationally in Colombia.  By offering both drilling and production services, Pioneer helps its customers in the oil and gas industry establish and maintain the flow of oil and natural gas throughout the productive life of a well.  Pioneer has over 52 years of experience assisting its customers with streamlining all aspects of their oilfield operations, from providing services prior to initial production through production, maintenance and eventual well abandonment.

9.     The combination of prolonged, depressed oil prices and the resulting reduction in demand for Pioneer's services, along with increased competition, caused the Company, with the assistance of its advisors, to consider and evaluate several strategic alternatives and transactions aimed at refinancing or restructuring its debt obligations with minimal disruption to its operations.  After thoroughly evaluating all options available to the Company in the face of continued industry headwinds and a declining stock price (which eventually resulted in delisting from the New York

Stock Exchange (the "NYSE")), the Company determined that an in-court option providing for the equitization of its senior unsecured notes would best allow it to significantly deleverage the Company and position itself for future success.

10.     As a result, the Debtors have commenced these Chapter 11 Cases to implement a carefully negotiated, comprehensive and consensual financial restructuring (the "Restructuring") of the Company's balance sheet to ensure the long-term viability of Pioneer.  Under the terms of the Restructuring, which are set forth in greater detail in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Pioneer Energy Services Corp. and its Affiliate Debtors* (the "Chapter 11 Plan" or the "Prepackaged Plan"), which was filed contemporaneously herewith, Pioneer will significantly deleverage its balance sheet from approximately $475 million of funded debt to approximately $213 million upon the occurrence of the effective date of the Prepackaged Plan. This reduction in the Company's funded debt will allow the Company to focus on long-term growth prospects and, in turn, strengthen its competitive position in the market.

11.     In addition, the Restructuring provides the Company with access to significant new capital pursuant to a rights offering of up to $125 million of convertible debt, substantially all of which will be backstopped by certain unsecured noteholders.  The rights offering will be open to existing eligible unsecured noteholders and eligible equity holders, as further described in the Prepackaged Plan and Rights Offering Procedures (as defined in the Prepackaged Plan).

12.     The Prepackaged Plan also provides that the legal, equitable and contractual rights of the Holders of Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed ABL Claims, Allowed Term Loan Claims and Allowed General Unsecured Claims (each as defined in the Prepackaged Plan) will be unaltered or fully satisfied by the Restructuring.  Moreover, notwithstanding that, based on the Debtors' valuation set forth in the *Disclosure Statement for*

*Joint Prepackaged Chapter 11 Plan of Reorganization of Pioneer Energy Services Corp. and Its Affiliated Debtors* (the "Disclosure Statement"),[2] holders of existing equity are not otherwise entitled to a distribution, such equity holders will nevertheless receive 5.75% of the new equity interests in reorganized Pioneer Energy under the Prepackaged Plan, to the extent their class votes to accept the Prepackaged Plan, and the right to participate in the Rights Offering in accordance with the Rights Offering Procedures.

13.     Pursuant to the Restructuring Support Agreement attached hereto as **Exhibit B** (the "Restructuring Support Agreement" or "RSA"), the holders of (i) over 99% of the aggregate amount outstanding under the Prepetition Term Loan Facility (as defined below) and (ii) approximately 75.9% of the principal amount outstanding under the Senior Notes (as defined below) have agreed, subject to the terms and conditions of the Restructuring Support Agreement, to support the Prepackaged Plan, including, in the case of the holders of Senior Notes, to vote in favor of the Prepackaged Plan.

14.     To minimize the impact of the Chapter 11 Cases on the Company and its businesses, the Debtors began soliciting votes on the Prepackaged Plan from holders of the Company's Senior Notes before commencing the Chapter 11 Cases.  On February 28, 2020, the Debtors commenced service of the solicitation materials (the "Solicitation Materials"), including the Disclosure Statement, the Prepackaged Plan, the various exhibits to those documents, a ballot and instructions

---

[2]     A copy of the Disclosure Statement is attached to the *Emergency Motion of Debtors for Entry of an Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Prepackaged Plan; (II) Conditionally Approving Disclosure Statement; (III) Approving Prepetition Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Conditionally (A) Directing the United States Trustee Not to Convene a Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities; (VII) Approving Rights Offering Procedures; and (VIII) Granting Related Relief* filed contemporaneously herewith (the "Solicitation Procedures Motion").

regarding the voting process, pursuant to Sections 1125 and 1126(b) of the Bankruptcy Code on holders of Senior Notes entitled to vote on the Prepackaged Plan and have requested that such holders submit their ballots by April 3, 2020 at 5:00 p.m. (Prevailing Central Time) (the "Voting Deadline").  The Debtors intend to serve the Solicitation Materials on the existing shareholders following the Bankruptcy Court's entry of an order approving the Solicitation Procedures Motion and will request that such shareholders submit their ballots by the Voting Deadline.  Further, the Debtors have requested that the Bankruptcy Court schedule a combined hearing to approve the Disclosure Statement and confirm the Prepackaged Plan on or around April 7, 2020.  The Debtors expect that the votes tabulated and received from the holders of Senior Notes will, consistent with the Restructuring Support Agreement, overwhelmingly support confirmation of the Prepackaged Plan.

## II.     The Debtors' Business and Capital Structure

### A.  *Business Overview*

15.     Pioneer was incorporated under the laws of the state of Texas in 1979 as the successor to a business that had been operating since 1968.  At that time, Pioneer had three land drilling rigs.  Since then, Pioneer has expanded through a combination of organic growth and targeted acquisitions, including the 2008 acquisition of WEDGE Well Services, LLC, WEDGE Wireline Services, LLC and certain of their affiliates and the 2011 acquisition of Go Coil, LLC, which form the basis of the Company's well servicing, wireline and coiled tubing services, respectively.  As of the Petition Date, Pioneer has twenty-five (25) drilling rigs, 123 well servicing rigs, ninety-three (93) wireline services units and nine (9) coiled tubing services units.

16.     Today, Pioneer's business is comprised of two business lines: (i) drilling services, including domestic drilling and international drilling; and (ii) production services, comprised of well servicing, wireline services and coiled tubing services.  Pioneer's drilling and production

services fleets operate in many of the most attractive oil and gas producing regions in the United States, including the Utica, Marcellus, Eagle Ford, Niobrara, Permian Basin and Bakken. By operating mobile fleet equipment between these domestic regions, Pioneer is able to diversify its geographic exposure and limit the impact of any regional slowdown.

17.     Debtor Pioneer Energy has thirteen direct and indirect subsidiaries as of the date hereof.  Each of the Debtors, other than Pioneer Services Holdings, LLC ("Pioneer Services Holdings"), entered into or guaranteed the Prepetition Debt (as defined below).  None of the non-Debtor subsidiaries, each of which is a foreign entity, are borrowers, issuers, guarantors or grantors in connection with the Prepetition Debt.  A chart illustrating the Company's organizational structure as of the Petition Date is attached hereto as **Exhibit A**.  Until recently, the common stock of Pioneer Energy (the "Common Stock") was traded on the NYSE under the symbol "PES."  The NYSE, however, delisted the common stock due to its low trading price levels in September 2019.

**B.  *Pioneer's Drilling Services and Production Services***

18.     Pioneer's land-based drilling services and production services span the full life cycle of oilfield operations, from initial exploration of potential sites, through development, production, maintenance and eventual abandonment of a site.  At each stage, Pioneer provides its customers with a range of services and expertise to enhance the economic value of the customers' oil and gas assets by optimizing development costs and maximizing production.  These services are organized into two business lines: drilling services and production services.  The Company's two business lines can be further broken down into five key operating segments: domestic drilling, international drilling, well servicing, wireline services and coiled tubing services.

19.     The Company generated total consolidated operating revenues of approximately $576 million for the fiscal year ending December 31, 2019.  Of the total revenues generated,

Pioneer's drilling services generated approximately 41.8% of total revenues; production services generated approximately 58.2% of total revenues.

### 1. Drilling Services (Domestic and International)

20.     Pioneer offers comprehensive drilling services by providing the drilling rig, crew, supplies and most of the ancillary equipment necessary to operate a drilling rig.  The Company's current drilling rig fleet is 100% pad-capable, which allows a series of horizontal wells to be drilled in succession by walking or skidding a drilling rig at a single pad-site location.  Pad drilling offers Pioneer's customers greater movement flexibility and efficiency by drilling multiple wells on a single pad during the same visit of a drilling rig.  Such techniques allow Pioneer's customers to drill increasingly longer horizontal wellbores (i.e., the holes initially drilled to form the well), which enables higher hydrocarbon production per well and reduces the overall number of wells needed to achieved desired production.

21.     Regarding the power used in such rigs, Pioneer utilizes alternating current ("AC") and silicon-controlled rectifier ("SCR") rigs, which generate electrical power through one or more engine generator sets and are considered more efficient, safe and precise than mechanical rigs driven by electric motors.  Each of the Company's rigs has 1,500 horsepower or greater drawworks, which is the primary hoisting machinery component of a rotary drilling rig.   The Company's utilization of AC and SCR rigs, and its removal of older, less capable rigs from its fleet, allows it to focus on providing a pad optimal fleet focused on the horizontal drilling market. Pioneer owns seventeen (17) AC rigs in the United States and eight (8) SCR rigs in Colombia.

22.     Pioneer's drilling contracts for individual wells are usually completed in less than thirty (30) days; however, the Company typically enters into drilling contracts of longer duration for newly constructed rigs and/or during periods of high rig demand.   The domestic and

international drilling segments generated approximately 26.4% and 15.4%, respectively, of Pioneer's overall revenues in the year ending December 31, 2019.

**2. Production Services**

23.     Pioneer's production services business segments provide a range of well, wireline and coiled tubing services, with operations concentrated in the major domestic onshore oil and gas producing regions in the Gulf Coast, Mid-Continent and Rocky Mountain states.  Such services can span the life cycle of a well and include, among others, logging the characterizations of the rock and fluid mixtures penetrated by drilling, perforation of the casing of the well to connect it to the reservoir, well maintenance activities and end-of-well activities to permanently close oil and gas wells.  Production services jobs are generally short term, ranging in duration from several hours to less than thirty (30) days, and typically represent a single performance obligation (either for a particular job, series of distinct jobs or period of time during which the Company stands ready to provide services as the customer requires).

a.   *Well Servicing*.  Through its well servicing segment, Pioneer offers optimization services to establish production in newly drilled wells and to maintain production over the useful life of active wells.  The Company's completion services provide a mechanical method to prepare a well for production by perforating the well casing to allow oil and gas flow, stimulating and testing such zones and installing the production string and other downhole equipment.  Through its well servicing fleet, the Company delivers periodic maintenance and major repairs or modifications to sustain optimal levels of oil and gas production.  The Company also performs plugging and abandonment services at the end of a well's useful life.

b.   *Wireline Services*.  Pioneer's wireline services allow oil and gas exploration and production companies to better understand the reservoirs they are drilling or

producing.  The Company's logging and perforating services are designed to establish a flow path between the reservoir and the wellbore and complete cased holes to protect the wellbore from fluids, pressures and stability problems.  Such services also include placing equipment in or retrieving equipment or debris from the wellbore, installing bridge plugs and controlling pressure.

    c.   *Coiled Tubing Services*.  Through its coiled tubing services, Pioneer enables companies to continue production during service operations on wells under pressure without shutting the well down, thereby reducing the risk of formation damage.  Coiled tubing services involve the use of a continuous flexible metal pipe that is spooled on a large reel and inserted into the wellbore to perform clean-outs, nitrogen jet lifts to displace fluids and reduce pressure, through-tubing fishing to remove wellbore obstructions, formation stimulation utilizing acid, chemical treatments and fracturing.

24.    Pioneer's production services generated approximately 58.2% of its overall revenues in the year ending December 31, 2019, including 20.1% from well servicing, 30% from wireline services and 8.1% from coiled tubing services.

**C.** *LiveSafe Program*

25.    Pioneer has an extensive focus on its safety program, LiveSafe, aimed at ensuring a work environment where its employees are committed to and recognize the possibility of always working without incident or injury.  In 2018, the Company's drilling business achieved record safety results and was ranked first among the top ten most active contractors.  Similarly, in 2018, its well servicing segment achieved its lowest total recordable incident rate in its history.  As a result of those actions, for the second year in a row, the Company achieved a consolidated total recordable incident rate below 1.0 (reflecting less than one work-related injury per 100 full-time

workers during a one-year period) and lowered its lost time incident rates for the fifth consecutive year, reaching the lowest in the Company's history.  Pioneer's excellent safety record and reputation remain critical to winning new business and expanding relationships with existing clients.

### D. *The Company's Capital Structure*

26.     As set forth below, as of the Petition Date, the Company has outstanding funded debt obligations of approximately $475 million, which consist of approximately (i) $175 million in secured borrowings under the Debtors' Prepetition Term Loan Credit Agreement (as defined below)[3] and (ii) $300 million in principal amount of Senior Notes.

### 1. Prepetition Indebtedness

#### a. Prepetition ABL Facility

27.     All Debtors, other than Pioneer Services Holdings, are borrowers (the "Prepetition ABL Borrowers") under that certain Credit Agreement, dated as of November 8, 2017 (as amended, restated, modified, supplemented or replaced from time to time, the "Prepetition ABL Credit Agreement") among the Prepetition ABL Borrowers, the lenders party thereto from time to time (the "Prepetition ABL Lenders") and Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "Prepetition ABL Administrative Agent" and, together with the Prepetition ABL Lenders, the "Prepetition ABL Secured Parties").  Each of the Prepetition ABL Borrowers are guarantors of the Prepetition ABL Credit Agreement pursuant to that certain Guaranty Agreement, dated as of November 8, 2017 (as amended and restated from time to time), in favor of the Prepetition ABL Agent.

---

[3]     As discussed below, as of the Petition Date, the Company's secured Prepetition ABL Facility (as defined below) remains undrawn.

28.     The Prepetition ABL Credit Agreement provides for an asset-based revolving credit facility (the "Prepetition ABL Facility") in a maximum aggregate principal amount of $75 million, subject to a borrowing base and including a $30 million sub-limit for letters of credit.  The obligations under the Prepetition ABL Credit Agreement in respect of the Prepetition ABL Facility are secured by liens on substantially all of the Debtors' assets, including, without limitation, 100% of the equity interests of the Prepetition ABL Borrowers (other than Pioneer Energy) (the "Prepetition Collateral").

29.     The Prepetition ABL Facility bears interest at the London Interbank Offered Rate ("LIBOR") plus a margin ranging from 2.75% to 3.25% or, at the Prepetition ABL Borrowers' option, the Base Rate (as defined in the Prepetition ABL Credit Agreement) plus a margin ranging from 1.75% to 2.25%, in each case based on the Average Excess Availability (as defined in the Prepetition ABL Credit Agreement) of the Prepetition ABL Borrowers for the most recently completed calendar month.  The applicable margin for borrowings bearing interest based on LIBOR is currently 1.75% per annum, and the applicable margin for borrowings bearing interest based on the Base Rate is currently 2.75% per annum.  The Prepetition ABL Facility matures on November 8, 2022, subject to an earlier springing maturity date under certain conditions.

30.     As of the Petition Date, the Prepetition ABL Facility remains undrawn, and the only amounts outstanding thereunder were undrawn letters of credit in the amount of $9.4 million and any accrued but unpaid indemnification obligations, fees and expenses and other obligations incurred in connection therewith.

**b. Prepetition Term Loan Facility**

31.     Debtor Pioneer Energy is the borrower under that certain Term Loan Credit Agreement, dated as of November 8, 2017 (as amended, restated, modified, supplemented or replaced from time to time, the "Prepetition Term Loan Credit Agreement") among Pioneer, the

lenders party thereto from time to time (the "Prepetition Term Loan Lenders"), and Wilmington Trust, National Association, as administrative agent (in such capacity, the "Prepetition Term Loan Administrative Agent" and, together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties").  The Prepetition Term Loan Credit Agreement provides for a term loan credit facility (the "Prepetition Term Loan Facility") in an initial aggregate principal amount of $175 million.  The obligations under the Prepetition Term Loan Credit Agreement in respect of the Prepetition Term Loan Facility are guaranteed by Pioneer Global Holdings, Inc., Pioneer Drilling Services, Ltd., Pioneer Production Services, Inc., Pioneer Wireline Services Holdings, Inc., Pioneer Wireline Services, LLC, Pioneer Well Services, LLC, Pioneer Fishing & Rental Services, LLC and Pioneer Coiled Tubing Services, LLC and secured by liens on the Prepetition Collateral.

32.     The Prepetition Term Loan Facility bears interest at LIBOR or the Base Rate (as defined in the Prepetition Term Loan Credit Agreement), at the option of Pioneer Energy, plus an applicable margin of 7.75% and 6.75% per annum, respectively.  The Prepetition Term Loan Facility matures on November 8, 2022, subject to earlier springing maturity dates under certain conditions, including a maturity date in December 2021 if, at such time, the aggregate amount of Senior Notes outstanding exceeds $15 million.

33.     As of the Petition Date, $175 million in principal amount remains outstanding under the Prepetition Term Loan Facility, plus any accrued but unpaid interest, indemnification obligations, fees and expenses and other obligations incurred in connection therewith.

### c.  Senior Notes

34.     Debtor Pioneer Energy is the issuer of 6.125% senior unsecured notes due March 15, 2022 (the "Senior Notes" and, together with the Prepetition ABL Facility and the Prepetition Term Loan Facility, the "Prepetition Debt") pursuant to that certain Indenture, dated as of March

18, 2014 (as amended, restated, modified, supplemented or replaced from time to time) with Wells Fargo Bank, National Association, as trustee, and certain of the Debtors as guarantors.  The Senior Notes are unsecured obligations and are *pari passu* with one another.

35.     As of the Petition Date, the aggregate outstanding principal amount of the Senior Notes is $300 million, together with any accrued but unpaid interest, indemnification obligations, fees and expenses and other obligations incurred in connection therewith.

### d. Intercreditor Agreement

36.     The respective rights and interests of the Prepetition ABL Lenders and Prepetition Term Loan Lenders are governed by that certain Intercreditor Agreement, dated as of November 8, 2017 (as amended, restated, modified, supplemented or replaced from time to time, the "Intercreditor Agreement") among Pioneer Energy, the Prepetition ABL Administrative Agent and the Prepetition Term Loan Administrative Agent.  Specifically, the Intercreditor Agreement governs the respective rights and interests of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties relating to, among other things, their rights and their ability to exercise remedies in connection with an ABL Event of Default or Term Event of Default (each as defined in the Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement, standstill and turnover provisions.  Pursuant to the Intercreditor Agreement, the Prepetition ABL Liens on the Prepetition Collateral consisting of ABL Priority Collateral (as defined in the Intercreditor Agreement) are first priority and senior to the Prepetition Term Loan Liens on such ABL Priority Collateral, and the Prepetition Term Loan Liens on the Prepetition Collateral consisting of Term Priority Collateral (as defined in the Intercreditor Agreement) are first priority and senior to the Prepetition ABL Liens on such Term Priority Collateral.

### e. Equity Ownership

37.     As discussed above, Pioneer Energy is a public company.  Until recently, the common stock of Pioneer Energy was traded on the NYSE under the symbol "PES."  The NYSE, however, delisted the Common Stock in September 2019 due to its low trading price levels.

38.     As of the Petition Date, 200,000,000 shares of the Debtors' $0.10 par value Common Stock had been authorized with 79,579,571 shares of Common Stock issued and outstanding.

## 2. Other Financing Arrangements and Indebtedness

39.     In addition to the foregoing, certain Debtors are parties to other financing arrangements.  These arrangements and facilities are described here solely to the extent they implicate one or more of the Debtors.  Certain non-Debtor affiliates may be party to additional financing arrangements.[4]

### a. Affiliate Financing Arrangements and Intercompany Loans

40.     As described in detail in the Cash Management Motion (defined below), in the ordinary course of business the Debtors maintain an integrated cash management system to collect, concentrate and transfer funds generated by the Debtors and their affiliates and subsidiaries and disburse those funds to satisfy their respective obligations, as directed and determined by the Debtors' treasury department.   This system includes a variety of routine intercompany transactions.

---

[4]     The non-Debtor subsidiaries routinely obtain bonds for bidding on drilling contracts, performing under drilling contracts and remitting customs and importation duties.   To facilitate these practices, such non-Debtor subsidiaries are party to certain bank guarantees in the aggregate amount of $70.2 million (as amended and restated from time to time, the "Bonding Obligations"); however, none of the Debtor entities are guarantors under such Bonding Obligations.

41.     Certain of the Debtors also routinely engage in business with one another and with their non-Debtor subsidiaries, generating ordinary course intercompany claims arising from, among other things, intercompany leases and the allocation of costs due to shared services, employees and equipment.  These intercompany financing arrangements are critical to the Debtors' business.  Continuation of these practices and procedures in the normal course during the pendency of these Chapter 11 Cases is essential to avoiding significant business disruptions.  As such, the Debtors intend to continue these arrangements in the normal course of business, subject to the terms described in the Cash Management Motion.

### b.  Ordinary Course Trade Debt

42.     In addition to the foregoing, the Debtors had approximately $25.3 million in ordinary course trade debt owed to third parties (excluding affiliates) that was unpaid as of the Petition Date.

### III.   Events Leading to the Chapter 11 Cases

**A.  *Recent Industry Trends***

43.     Pioneer's performance is closely linked to market trends in the oil and gas industry and, in particular, the volatility of oil and natural gas prices.  The last five years, however, have seen a significant and sustained drop in oil and gas prices.  Oil and gas prices are dependent on factors beyond the Company's control, including the supply of and demand for oil, weather conditions and political conditions, among others.  As a result of this sustained market downturn, oil and gas companies around the world have dramatically curtailed capital and operating expenditures dedicated to oil and gas exploration, development and production.  This, in turn, has caused a commensurate drop in demand for the products and services offered by Pioneer and its competitors.  In fact, many of Pioneer's competitors in the oilfield services space, whose

businesses are also dependent on spending by oil and gas companies, have filed for bankruptcy in the last several years.

44.     The sustained drop in oil and gas prices has impacted companies throughout the oil and gas industry including Pioneer and the majority of its customers.  As spending on exploration, development and production of oil and natural gas has decreased so too has demand for Pioneer's services.  The decline in spending by oil and gas companies has had a significant effect on the Debtors' financial health and prospects.

45.     In addition to the issues facing the oil and gas industry generally, Pioneer operates in a highly competitive market.  The oilfield services industry is saturated with competition from various companies that operate in the same sectors and the same regions of the world as Pioneer. The primary competitive factors that Pioneer faces include safety, performance, price, quality and breadth of products and services.  Pioneer also faces competition from regional suppliers in some of the sectors in which it operates as these suppliers provide mobile equipment that can be moved from one market to another in response to market conditions.  This heavily competitive market has impacted the Company's ability to maintain its market share and defend or maintain the pricing for its services.  Heavy competition has also impacted the Company's ability to negotiate favorable contract terms with its customers and suppliers, which, on occasion has resulted in the Company accepting suboptimal terms.

46.     The Company's operations are also subject to extensive federal, international, state and local laws and regulations governing environmental quality, pollution control, remediation of contamination, preservation of natural resources, transportation, work safety and other matters. Compliance with the various requirements imposed by these laws and regulations has also resulted

in increased capital expenditures as companies in these sectors have had to make significant investments to ensure compliance.

**B.  *Prepetition Efforts to Combat Market Downturn***

47.     As with many of its peers, Pioneer has worked diligently to respond to the adverse market conditions and heavy industry competition.  As described below, Pioneer has implemented broad cost-saving measures to reduce operating expenses while preserving operational capacity and revenue margins.  The Company and its management team focused primarily on cutting costs, reducing capital expenditure and managing liquidity.

**1.  Cost-Cutting Initiatives and Operational Adjustments**

48.     Pioneer has initiated significant cost-saving measures in response to the ongoing market downturn.  In doing so, Pioneer has prioritized protecting its operational capabilities so that it is well situated to respond when the market changes.  Accordingly, these efforts have been highly strategic and focused on an effort to reduce overhead and eliminate inefficiencies without jeopardizing or impairing Pioneer's operational capabilities.

49.     Specifically, in 2015 and 2016, Pioneer reduced its total headcount by over 50%, reduced wage rates for its operations personnel, reduced incentive compensation and eliminated certain employment benefits.  In 2016, the Company closed 10 field offices to reduce overhead and associated lease payments.  At the same time, the Company lowered its capital expenditures by 77% to primarily routine expenditures that were necessary to maintain its equipment and deferred discretionary upgrades and additions (except those that it had previously committed to make during the 2014 market slowdown).

50.     Pioneer has also implemented key operational initiatives to maximize revenue by deploying its products and services in new ways that better serve the demands of its customers. By way of example, with increased industry activity and pricing during 2017 and 2018, Pioneer

resumed efforts to build value in its core businesses by redeploying assets to areas with improving demand, selectively upgrading its fleets and executing limited strategic growth. Specifically, Pioneer positioned itself as a leading provider in domestic shale regions as not all of its competitors' rigs are capable of working in unconventional shale-producing regions. The Company's domestic drilling and production services fleets are, however, highly capable and designed for operation in shale's long lateral, pad-oriented environment.

51.     Since the first quarter of 2019, the Company continued its cost-reduction initiatives and operational adjustments. Specifically, the Company negotiated reductions in vendor pricing, reduced headcount and compensation and closed certain of its operating locations. The Company also made operational adjustments including, among other things, the appointment of a Chief Operating Officer to centralize operational and sales leadership for all business segments and a Chief Strategy Officer to lead a team designed to identify market opportunities, execute strategic initiatives and enhance Pioneer's fleet performance across all business units.

52.     Despite implementing these initiatives, the Company continued to face declining revenue and cash flow, as well as significant market challenges. Moreover, as discussed above, the highly competitive market in which the Company operates posed challenges for the Company in winning bids from new customers, resulting in further decreased revenue.

**2. Strategic Divestitures**

53.     As part of the Company's overall operational adjustments, Pioneer's management team conducted a detailed review of all of the Company's assets, the ability to invest in growth and the overall role of the assets in the Company's long-term strategy. Management and the board determined that there were assets that could be sold, which would increase liquidity and concentrate the Company's focus on its key product lines and services.

54.     From 2015 to 2018, the Company liquidated nonstrategic or noncore assets. Specifically, Pioneer sold thirty-nine (39) non-AC domestic drilling rigs, thirty-three (33) older wireline units, seven smaller diameter coiled tubing units and various other drilling and coiled tubing equipment for aggregate net proceeds of over $75 million.  As of September 30, 2019, the Company reported another $6.2 million in assets remaining held for sale, including the fair value of buildings and yards for one domestic drilling yard and two closed wireline locations, one domestic SCR drilling rig, two coiled tubing units and spare support equipment.

**3. Efforts to Improve Liquidity**

55.     In conjunction with management's efforts to institute its cost-cutting and operational adjustment initiatives, it became apparent that the Company's revenue and cash flow generating capacity would be insufficient to service its outstanding debt on a long-term basis and to maintain the liquidity necessary to operate its business and maximize long-term enterprise value. In December 2016, the Company sold 12.1 million shares of its Common Stock in a public offering and applied the net proceeds to reduce its outstanding debt under its then-revolving credit facility.

56.     In November 2017, the Company entered into the Prepetition ABL Facility and Prepetition Term Loan Facility, the proceeds of which were used to pay and extinguish its prior revolving credit facility which was set to mature in 2019.

**C.  *Preparation for Chapter 11; Negotiations with Creditors***

57.     By the spring of 2019, management determined that – notwithstanding its ongoing cost-cutting efforts, strategic divestitures, and other efforts to improve liquidity – further steps needed to be taken to enable the Debtors to successfully weather the ongoing downturn and avoid eventual default.  Although the Company's Prepetition Term Loan Facility does not mature until December 2021, in May 2019, management retained Lazard Frères & Co., as investment banker, and Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel, to begin proactively exploring

various strategic and other alternatives to address the uncertainties related to its ability to refinance its outstanding debts as their maturities approached, including the incurrence of new indebtedness and other potential M&A transactions.  Management, however, concluded that these alternatives to restructuring were not feasible or commercially practicable, and that it was in the Company's best interests to pursue financial restructuring proactively.

58.     Management, aided by its advisors and the Company's existing counsel at Norton Rose Fulbright, soon began discussions with the Company's stakeholders.   In June 2019, management commenced negotiations with an ad hoc committee of holders of the Company's Notes (the "Ad Hoc Noteholder Group"), represented by Davis Polk & Wardwell LLP, as counsel, Haynes and Boone LLP, as Texas counsel, and Houlihan Lokey, Inc., as financial advisor.  During an eight-month negotiation period, the Company's financial condition worsened, and its common stock declined.  On August 14, 2019, the NYSE suspended trading in the Company's common stock due to low-trading price levels, and delisted the Company on September 9, 2019.

59.     In October 2019, to maximize the Company's flexibility in terms of implementing a potential transaction, the Company also retained Alvarez & Marsal North America, LLC to assist it in preparing for possible in-court restructuring proceedings.  After extensive good faith and arms' length negotiations, the parties reached a final agreement in February 2020, which, in the opinion of management, reflected terms that were in the best interest of the Company.

60.     ***Execution of Restructuring Support Agreement***.  On February 28, 2020, following months of negotiations with the Company's stakeholders, the Company entered into the Restructuring Support Agreement, which, among other things, outlines the terms of a comprehensive financial restructuring with (i) Prepetition Term Loan Lenders holding over 99% in the aggregate amount outstanding under the Prepetition Term Loan Facility and (ii) members of

the Ad Hoc Noteholder Group holding over 75% in the aggregate of the principal amount outstanding under the Senior Notes.  This represents an overwhelming level of support and will play a meaningful role in ensuring the success of these prepackaged cases.  The RSA envisions a balance sheet restructuring of the Company's funded indebtedness and an infusion of up to $125 million in new money through a nearly fully backstopped rights offering of 5% convertible senior unsecured payment-in-kind bonds (the "New Convertible Bonds").   In addition, the Ad Hoc Noteholder Group committed to purchase exit secured bonds to be issued by reorganized Pioneer in the principal amount of $78.125 million upon issuance (the "New Secured Bonds") to support the reorganized Debtors and ensure success of the future of their businesses.

61.     The specific terms of the proposed transaction are detailed in a comprehensive term sheet (as amended from time to time, the "Term Sheet") attached as an exhibit to the Restructuring Support Agreement.

62.     The key terms of the transaction described in the Term Sheet are as follows:

| **Key Term** | **Description** |
|---|---|
| **Prepetition ABL Facility** | The Prepetition ABL Lenders will receive payment in full in cash to the extent the Prepetition ABL Facility has not been repaid with the proceeds of the DIP Facility. |
| **Prepetition Term Loan Facility** | Each Prepetition Term Loan Lender will receive payment in full in cash. |
| **Senior Notes** | Each holder of Senior Notes will receive its pro rata share of 94.25% of the equity in reorganized Pioneer (and, if the class of existing shareholders does not vote to accept the Plan, such percentage will increase to 100%), subject to dilution on account of the employee incentive plan, the New Convertible Bonds and the Backstop Commitment Premium (as defined below). <br><br> Each eligible holder of Senior Notes will also receive the right to participate in the Rights Offering, along with stapled special voting stock pursuant to and in accordance with the Rights Offering Procedures. |

| General Unsecured Claims | All trade and other unsecured claims will be unimpaired by the Chapter 11 Cases. These claims will ride through the Chapter 11 Cases and be paid in the ordinary course of business. |
|---|---|
| Equity Holders | Each existing shareholder of Pioneer Energy will receive its pro rata share of 5.75% of the equity in reorganized Pioneer, subject to dilution on account of the employee incentive plan, the Convertible Bonds and the Backstop Commitment Premium, subject to the class of existing shareholders voting to accept the plan.<br><br>Each eligible existing shareholder will also receive the right to participate in the Rights Offering, along with stapled special voting stock, pursuant to and in accordance with the Rights Offering Procedures. |
| Rights Offering | Reorganized Pioneer will raise up to $125 million in new capital through a partially backstopped rights offering (the "Rights Offering"). The Rights Offering will be open to (i) all eligible holders of Senior Notes and (ii) all eligible existing shareholders who voted to accept the Prepackaged Plan.<br><br>Participants in the Rights Offering will receive up to $123.205 million of New Convertible Bonds in the aggregate principal amount and up to 9,240,375 shares of stapled special voting stock as of the effective date of the Chapter 11 Plan.<br><br>Pioneer Energy's existing management will purchase up to the first $1.795 million of the New Convertible Bonds and 134,625 shares of special stapled voting stock under a backstop commitment agreement entered into simultaneously with the RSA. |

63.     In connection with execution of the RSA and agreement on the foregoing restructuring terms, the Company and its advisors also reached agreement with PNC Bank, National Association ("PNC") regarding the financing that would be necessary to fund the Chapter 11 Cases. Specifically, in parallel with reaching agreement on the Term Sheet, PNC committed to provide the Debtors with a $75 million asset-based revolving term loan debtor-in-possession financing facility (the "DIP Financing"). The DIP Financing has a five-month term and standard covenants and terms. Amounts outstanding under the DIP Financing will bear interest, at the Debtors' option, (i) at the Base Rate plus 1% or (ii) at the LIBOR Rate plus 2%. The DIP Financing

also provides for certain fees, including an annual unused facility fee of 0.50% and standard letter of credit fees.  Upon emergence from these Chapter 11 Cases, the DIP Financing will convert dollar for dollar into an exit financing facility.  In connection with execution of the RSA and agreement on the foregoing restructuring terms, the Prepetition Term Loan Lenders also consented to the Debtors' use of their prepetition cash collateral for the pendency of the Chapter 11 Cases.

64.     Finally, as part of this comprehensive negotiation, Pioneer negotiated with the Ad Hoc Noteholder Group to ensure that substantially all of the Rights Offering would be backstopped.[5]  The Term Sheet sets forth the terms on which the members of the Ad Hoc Noteholder Group (the "Commitment Parties") have agreed to backstop the Rights Offering and certain members of management will purchase $1.795 million of the New Convertible Bonds.  The backstop commitment agreement also provides for certain termination rights for both Pioneer Energy and the Commitment Parties.  The Commitment Parties will receive a commitment premium of 8% of the total committed amount of the rights offering (the "Backstop Commitment Premium"), payable in New Convertible Bonds on the effective date of the Chapter 11 Plan; in the event the Chapter 11 Plan is not consummated because the Company has determined to pursue an alternative transaction that it determines is superior and if the backstop commitment agreement is terminated under certain circumstances as set forth therein, the Commitment Parties shall be paid the Backstop Commitment Premium in cash.  In addition, certain members of the Ad Hoc Noteholder Group committed to purchase the New Secured Bonds in the principal amount of $78.125 million upon issuance pursuant to the RSA to, among other things, refinance and replace the Company's existing Prepetition Term Loan Facility.

---

[5]     Pursuant to the Chapter 11 Plan, as of and subject to the occurrence of the effective date of the Chapter 11 Plan and the payment of any applicable cure claims, any backstop commitment agreement shall be deemed assumed.

65.     The RSA documents the parties' commitment to the restructuring transaction described above.  As such, it is an important component of the Debtors' restructuring efforts and provides the Debtors with significant assurances regarding the ultimate success of its Chapter 11 Cases.  In particular, by signing the RSA, the signing parties have agreed to support the restructuring process on the terms set forth in the Term Sheet and in the RSA.  This includes an agreement by these parties to take any steps and actions that are reasonably necessary to implement the restructuring transaction, including voting in favor of the Chapter 11 Plan subject to receipt of appropriate solicitation materials, including the Debtors' Chapter 11 Plan and Disclosure Statement.  In exchange, the Company has agreed, among other things, that the key documents necessary to implement the transaction must be reasonably acceptable to a supermajority of the supporting noteholders and Prepetition Term Loan Lenders.

66.     ***Milestones; Solicitation Process***.  To minimize costs and the potential disruptions to the business that could result from the chapter 11 filings, the Debtors and their key constituencies made it a priority to minimize the duration of the Chapter 11 Cases.  As a result, the RSA obligates the parties to work expeditiously to consummate the restructuring described in the Term Sheet and establishes a number of milestones (the "Milestones") to govern that process, including the following:

- filing the Chapter 11 Plan and Disclosure Statement no later than one (1) calendar day after the Petition Date;

- obtaining an order approving the Disclosure Statement no later than forty-five (45) calendar days after the Petition Date;

- confirming the Chapter 11 Plan no later than forty-five (45) calendar days after the Petition Date (the "Confirmation Date"); and

- consummating the restructuring pursuant to the Chapter 11 Plan no later fourteen (14) calendar days after the Confirmation Date.

Accordingly, the Debtors are seeking authority to schedule a combined hearing to (i) approve the Disclosure Statement and (ii) consider confirmation of the Prepackaged Plan on or around April 7, 2020.

67.     To meet this schedule, the Debtors spent considerable time and effort in the period leading up to the Petition Date drafting and negotiating all of the material documents necessary to implement the agreed restructuring.  This includes, among many other documents, the Chapter 11 Plan, which was filed contemporaneously herewith, and all of the related documents, including the Disclosure Statement and various exhibits thereto – all of which were substantially finalized prior to the Petition Date.  Given this level of preparation and overwhelming support from the voting constituencies, the Debtors were able to commence the solicitation process for their Chapter 11 Plan prior to the Petition Date.

68.     As discussed above, to minimize the impact of the Chapter 11 Cases on the Company and their businesses, the Debtors launched their prepetition solicitation effort on February 28, 2020, and provided the holders of Senior Notes with the Solicitation Materials to enable them to vote on the Chapter 11 Plan.  In those materials, the Debtors established April 3, 2020 as the deadline for the holders of Senior Notes that are party to the Restructuring Support Agreement to vote on the Chapter 11 Plan.  Notably, because all other creditors, including general unsecured creditors, are unimpaired under the Chapter 11 Plan, the Debtors have not solicited – and do not intend to solicit – votes from any other creditor group and intend to solicit equity holders following the Petition Date.

69.     Within four (4) business days of conditional approval of the Disclosure Statement, the Debtors intend to provide the Solicitation Materials to registered holders and beneficial owners

of Pioneer's Common Stock, which advises such parties, among other things, that the deadline for submitting a postpetition ballot to accept or reject the Chapter 11 Plan is the Voting Deadline.

70.     Contemporaneously with the filing of this declaration and the various First Day Motions, the Debtors have also filed a motion to establish procedures for the solicitation and plan objection process (the "Solicitation Motion").  Given the milestones established by the RSA and the Debtors' commencement of solicitation prior to the Petition Date, in the Solicitation Motion, the Debtors have also sought (i) conditional approval from the Bankruptcy Court regarding the adequacy of the information contained in the Disclosure Statement and other solicitation materials and (ii) a combined hearing regarding the adequacy of the information contained in the Disclosure Statement and confirmation of the Chapter 11 Plan.  Finally, the Solicitation Motion also proposes to provide parties in interest with notice of the commencement of these Chapter 11 Cases and with notice of this combined hearing by means of a single, comprehensive notice.

71.     In the Solicitation Motion, the Debtors have proposed the following schedule for the solicitation and plan confirmation process, which is consistent with the milestones established by the RSA:

| | |
|---|---|
| **Voting Record Date** | February 27, 2020 |
| **Commencement of Solicitation to Eligible Noteholders** | February 28, 2020 |
| **Petition Date** | March 1, 2020 |
| **Distribution of Combined Notice** | March 5, 2020 |
| **Plan Supplement Deadline** | March 25, 2020 |
| **Objection Deadline** | March 30, 2020 at 5:00 p.m. (Prevailing Central Time) |
| **Voting Deadline** | April 3, 2020 at 5:00 p.m. (Prevailing Central Time) |
| **Reply Deadline** | April 6, 2020 at 5:00 p.m. (Prevailing Central Time) |
| **Combined Hearing** | April 7, 2020 |

To meet the RSA milestones and this proposed schedule, the Debtors intend to have the Solicitation Motion heard at the first hearing in these Chapter 11 Cases.  I understand that the relief requested in the Solicitation Motion, including the presentation of this motion at the first day hearing, is consistent with standard practice regarding such "prepackaged" chapter 11 cases.  Moreover, I believe that the proposed schedule for these Chapter 11 Cases as dictated by the RSA milestones is in the best interests of the estates and parties in interest as it will minimize the disruption to the business that may be caused by the filing, and will reduce the costs associated with a lengthy stay in chapter 11.  Furthermore, given the highly consensual nature of this proceeding, and the limited categories of parties who will be impacted by the Chapter 11 Plan, I believe that an expedited notice and solicitation period is appropriate under the circumstances.

72.     Finally, in conjunction with the launch of the solicitation process in the days leading up to the Petition Date, the board of directors of Pioneer Energy and each subsidiary board or other governing body for the other Debtors approved and authorized the filing of these Chapter 11 Cases and the other steps necessary to implement the proposed restructuring, having determined that it was in the best interests of each of the Debtors and its respective stakeholders to implement the agreed financial restructuring in this manner.  Thereafter, each of the Debtors filed its chapter 11 petition to commence these Chapter 11 Cases.

## IV.   First Day Motions

73.     As a result of my first-hand experience, and through my review of various materials and information, discussions with members of the Debtors' management and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions described below and (b) the immediate and irreparable harm to which the Debtors and their businesses will be exposed unless the relief requested in the First Day Motions is granted without delay.

74.     I submit this Declaration in support of the Petitions and the First Day Motions filed with the Court in these cases and as described below.

75.     I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct.  This representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

76.     The relief sought in the First Day Motions is critical to the success of these Chapter 11 Cases.  The First Day Motions will maximize value for the Debtors' estates and stakeholders by reducing unnecessary disruption and minimizing any adverse effects caused by the chapter 11 filings on the Debtors' businesses and operations.  As described more fully below, the Debtors, in consultation with their professionals, have carefully tailored the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm.  For the reasons set forth below, I believe that the relief requested in each of the First Day Motions is appropriate under the circumstances and should be granted by the Court.

77.     ***Motion for Joint Administration of Related Chapter 11 Cases***.  By this motion, the Debtors seek authorization to jointly administer these Chapter 11 Cases for procedural purposes only.  Many of the motions, applications, hearings and orders that will arise in these Chapter 11 Cases will jointly affect each Debtor.  Thus, I believe it is appropriate to jointly administer these cases, thereby reducing fees and costs, avoiding needless duplicative filings and enabling a more efficient and economical administration of the Chapter 11 Cases.  Furthermore, I

understand that creditors' rights will not be adversely affected as this motion seeks only administrative, not substantive, consolidation of the estates.

78.     ***Motion to Honor Counterparty Contracts***.  By this motion, the Debtors seek entry of an order authorizing the Debtors to continue to perform under their existing third-party customer contracts in the ordinary course of business and to enter into new contracts without further Court order.   In the ordinary course of business, the Debtors and their non-Debtor affiliates routinely enter into contracts (the "Customer Contracts") with a wide variety of customers.  While I understand that these contracts will not be terminated or otherwise altered by the filing of these Chapter 11 Cases, and that their terms will continue to be enforceable, each of the Debtors' business lines depends on its key customers, the loss of which could have a negative effect on the Company's business and revenues.   Consequently, I believe the expiration, termination or cancelation of existing Customer Contracts or the failure to execute new Customer Contracts, even in the short term, could drastically reduce the Company's revenue.

79.     I believe maintaining the existing Customer Contracts and the ability to execute extension options thereto, as well as the ability to attract, seek, enter into and secure new Customer Contracts at competitive rates is critical to the Debtors' long-term success and viability.  Even short-term interruptions of drilling activity can leave the Debtors with lost revenue or can give rise to customer termination rights, thereby threatening the Debtors' ability to afford current and future businesses expenses.  Accordingly, the Debtors intend to use this order to help their creditors and other interested parties understand the consequences of the Chapter 11 Cases and thereby ensure that the Debtors' ongoing business contracts remain in place.  Entry of such an order will aid the estates in managing the expectations of their contract counterparties.  Moreover, entry of this order will not harm any party in interest as I understand that it seeks only confirmation of the operation

of the Bankruptcy Code and the ability of debtor-in-possession to operate in the ordinary course during these proceedings.

80.     ***Motion to Approve Continued Use of Cash Management System***.  By this motion (the "Cash Management Motion"), the Debtors seek entry of an interim and final order: (i) authorizing the Debtors to continue using their existing cash management system, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing the continuation and satisfaction of certain intercompany transactions, (iv) authorizing the Debtors to continue using prepetition bank accounts and existing business forms, (iii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis with respect to the Debtors' deposit and investment practices, and (iv) granting administrative expense priority to the Debtors' intercompany transactions and loans.

81.     To lessen the impact of the chapter 11 filings on the Debtors' business, I believe it is vital that the Debtors keep their cash management system in place and be authorized to pay outstanding fees owed in relation to the Debtors' bank accounts, such as payments to third-party vendors whose services are critical for the uninterrupted operation of the cash management system. As described above, the Debtors operate a comprehensive cash management system; any disruption to that system would severely impair the operations of the Debtors and their non-Debtor affiliates and ability of those parties to optimize their business performance to the detriment of all parties in interest.

82.     ***Motion for Authority to Pay Prepetition Wages and Continue Benefits***. By this motion (the "Wages Motion"), the Debtors seek entry of an interim and final order: (i) authorizing the Debtors to pay or otherwise honor all prepetition employee obligations, (ii) authorizing, but not directing, the Debtors to continue in the ordinary course of business their employee programs

and (iii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' bank accounts to make the foregoing payments.

83.     As described in detail in the Wages Motion, the Debtors have approximately 1,675 employees.   This workforce generally relies exclusively on the compensation and benefits provided by or funded by the Debtors to continue to pay their daily living expenses, and will be exposed to significant financial difficulties if the Debtors are not permitted to pay these obligations.  I believe that if they are unable to honor all such obligations immediately, morale and loyalty will be jeopardized at a time when the support of these individuals is crucial.

84.     Moreover, a stable workforce is critical to the uninterrupted continuation of the Debtors' business and the preservation and maximization of the value of the Debtors' estates during these Chapter 11 Cases.  Any significant number of departures or deterioration in morale among the Debtors' workforce at this time will immediately and substantially adversely impact the Debtors' efforts in chapter 11 and result in immediate and irreparable harm to the Debtors' estates and creditors.  There is a real, immediate risk that if the Debtors are not authorized to continue to honor their prepetition obligations to these parties in the ordinary course, the employees and independent contractors would no longer support and maintain the operations of the Debtors, thereby crippling them.  Absent an order granting the relief requested the Wages Motion, many employees would undoubtedly suffer hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain employees to meet their own personal financial obligations. Without the requested relief, the stability of the Debtors would be undermined, perhaps irreparably, by the possibility that otherwise loyal employees will seek other employment alternatives. Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

85.     I strongly believe it is critical that the Debtors be permitted to pay prepetition wages and continue with their ordinary course personnel policies, programs and procedures, including, but not limited to, maintenance of workers' compensation programs and health care programs, that were in effect prior to the Petition Date.

86.     ***Motion for Entry into DIP Financing and Use of Cash Collateral.***  By this motion (the "DIP Motion"), the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to obtain senior secured super-priority postpetition financing, (ii) authorizing use of cash collateral ("Cash Collateral"), (iii) granting priority liens and superpriority claims to the DIP Lenders (as defined in the motion), (iv) granting adequate protection; and (v) granting related relief.

87.     As described above, as part of their comprehensive restructuring agreement, as embodied in the RSA and accompanying Term Sheet, the Debtors have negotiated with PNC to obtain postpetition financing (the "DIP Financing") to fund the Debtors' operations during these Chapter 11 Cases.  The DIP Financing and the other related agreements regarding the use of Cash Collateral and adequate protection (collectively, the "DIP Documents") are the result of extensive negotiations with PNC, the Prepetition Term Loan Lenders and the Ad Hoc Noteholder Group, conducted in good faith and at arm's length.  I believe that the proposed DIP Financing is the best available option available to the Debtors, and the Debtors have therefore negotiated to obtain the DIP Financing on the best and most realistic terms available.

88.     The Debtors have been and are unable to obtain sufficient and otherwise viable financing on terms superior to the proposed DIP financing under the current circumstances pursuant to section 364(d) of the Bankruptcy Code.  Accordingly, the Debtors propose to obtain the DIP Financing by providing, among other things, superpriority claims, security interests and liens pursuant to sections 364(c)(1), (2), (3), and (d) of the Bankruptcy Code.

89.     The Debtors also require the use of Cash Collateral to ensure that they have the liquidity necessary to fund their ordinary course business operations and the administration of these Chapter 11 Cases while effectuating the restructuring transaction.  Without the ability to use Cash Collateral, the Debtors' liquidity needs would not be satisfied, jeopardizing the Debtors' ability to successfully reorganize.  Thus, the use of Cash Collateral is imperative to the success of these Chapter 11 Cases.

90.     Approval of the DIP Financing and the use of Cash Collateral will provide immediate access to capital that is needed to, among other things, pay employees and vendors while minimizing disruptions to day-to-day business, thereby preserving and maximizing the value of the Debtors' estates.  Absent the DIP Financing, the Debtors' operations would come to a halt, resulting in irreparable harm to their businesses and their going-concern value.  Importantly, the relief requested in the DIP Motion also reflects an agreement between the Debtors and the affected lenders regarding the use of Cash Collateral during these Chapter 11 Cases and is, therefore, consensual.

91.     Accordingly, for these reasons, I believe that the relief requested in the DIP Motion is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

92.     ***Motion for Authority to Continue Insurance and Pay Prepetition Claims***.  By this motion, the Debtors seek authority to continue their existing insurance policies and surety arrangements and to pay premiums and other amounts arising thereunder, including any prepetition amounts.  Maintaining the existing insurance programs is necessary to preserve the value of the estates and the Debtors' business.  Any lapse or disruption in insurance coverage could result in immediate and severe consequences for the business, as well as the value of the Prepetition

Collateral.  Absent sufficient and continuing insurance coverage, the Debtors may also be exposed to substantial liability and may be unable to operate in certain key jurisdictions.

93.     ***Motion for Authority to Pay Prepetition Taxes***.  By this motion, the Debtors seek authority to pay taxes, fees, assessments and other charges to applicable taxing authorities in the ordinary course of business, including any prepetition amounts that may be due.  The Debtors' failure to pay certain taxes and fees when due may adversely affect their business operations. Depending on the relevant jurisdiction, tax authorities may have the ability to initiate audits if taxes and fees are not timely paid.  Similarly, tax authorities may attempt to suspend the Debtors' operations, seek to lift the automatic stay or even seek to hold the Debtors' directors and officers personally liable for any unpaid amounts.  Moreover, I understand that certain taxes and fees may give rise to tax liens and some or all may be entitled to priority, which would therefore require that these amounts be paid in full.

94.     ***Motion to Establish Utility Procedures***.  By this motion, the Debtors seek entry of an order prohibiting utility companies from altering, refusing or discontinuing utility services and to establish procedures for determining adequate assurance of payment.  In the ordinary course of their businesses, the Debtors obtain electricity, natural gas, water, water disposal, telecommunications and other similar services.  Uninterrupted utility services are vital to the continued operation of the Debtors' businesses and, consequently, to the success of their Chapter 11 Cases.  The relief requested in this motion will ensure that the Debtors' business operations will not be disrupted and will provide utility companies and the Debtors with an orderly, fair procedure for determining adequate assurance of payment as required by the Bankruptcy Code.

95.     ***Motion to Authorize Payment of Prepetition Trade Claims.***  By this motion, the Debtors seek authority to pay the prepetition claims of all prepetition trade creditors, including

vendors, suppliers and service providers, in the ordinary course of business.  The Debtors estimate that, as of the Petition Date, the total outstanding trade claims is approximately $25.3 million.  The Debtors believe that this authority is consistent with the premise of these consensual, prepackaged Chapter 11 Cases that the financial restructuring cause as little disruption to the business as practicable.  Indeed, under the Chapter 11 Plan filed contemporaneously herewith, the Debtors have proposed to pay in full all prepetition claims in the ordinary course of business after emergence.  Thus, the relief requested in this motion affects the timing of such payments, and not the amounts that these creditors would receive.

96.     Moreover, of this amount of prepetition trade debt, the Debtors estimate that approximately $4.7 million is owed to parties who could assert liens in the event of nonpayment and approximately $5.9 million is owed to parties who would qualify for priority treatment under section 503(b)(9) of the Bankruptcy Code.  Accordingly, ample justifications exist for the payment of these claims during the pendency of these Chapter 11 Cases.

97.     Given the nature of the Debtors' business, the Debtors rely heavily on shipping, logistics and other services to transport a variety of materials, products, equipment and supplies to and from the Debtors' customers and vendors.  The Debtors also routinely rely on warehousemen to repair, process and store materials as well as mechanics and materialmen who perform services for the Debtors.  Accordingly, a substantial amount of the Debtors' total prepetition trade debt is owed to various parties who could refuse to release goods of the Debtors that are in their control and possession or who could assert liens on the Debtors' property.  In the event these parties exercised such remedies, I believe the Debtors' operations would suffer immediate and irreparable harm because they would be unable to use the machinery, equipment and inventory in their daily operations or deliver goods en route to their customers.

98.    ***Motion to Authorize Filing of a Consolidated List of Creditors.***  By this motion, the Debtors seek entry of an order authorizing them to file a consolidated creditor matrix in lieu of submitting separate mailing matrices, to redact certain personal information and to approve the form and manner of notifying the creditors of these Chapter 11 Cases.  Given the interrelated nature of the Debtors' business operations, the preparation of separate lists of creditors for each Debtor would be expensive, time consuming and administratively burdensome; as such, utilizing a consolidated list of key creditors will help alleviate these burdens and costs, while reducing the possibility of duplicative service.  In this motion, the Debtors also seek to serve a single notice of commencement on the creditors and seek approval of the form thereof.  The proposed form of notice of commencement has been consolidated with the notice regarding the Disclosure Statement and plan process as described in the Solicitation Motion.  The Debtors believe that combining these critical notices into one document will avoid unnecessary costs and potential confusion associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix.  Accordingly, the Debtors believe that filing a consolidated list of creditors and serving a single notice of commencement combined with the solicitation notice will maximize efficiency and assist in an orderly transition into chapter 11.

99.    ***Motion to Establish Equity Trading Procedures.***  By this motion (the "Equity Trading Motion"), the Debtors seek entry of interim and final orders: (a) approving certain notification and hearing procedures related to certain transfers of or declarations of worthlessness with respect to Debtor Pioneer Energy's existing Common Stock or any Beneficial Ownership[6]

---

[6]    "Beneficial Ownership" will be determined in accordance with the applicable rules of section 382 of the Internal Revenue Code (the "IRC") and the Treasury Regulations thereunder (other than Treasury Regulations Section 1.382-2T(h)(2)(i)(A)) and includes direct, indirect and constructive ownership (e.g., (1) a holding company would be considered to beneficially own all equity securities owned by its subsidiaries, (2) a partner in a partnership would be considered to beneficially own its proportionate share of any equity securities owned by such partnership, (3) an individual and such individual's family members may be treated as one individual, (4) persons

thereof (the "Procedures"), (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to, Common Stock in violation of the Procedures shall be null and void *ab initio*, (c) scheduling a final hearing to consider approval of this motion on a final basis, and (d) granting related relief.

100.    As of the Debtors' fiscal tax year ending December 31, 2019, the Debtors had federal net operating loss ("NOL") carryovers in the amount of approximately $443 million and disallowed business interest carryforwards of approximately $31 million.  These NOLs and certain other tax attributes (the "Tax Attributes") provide the potential for material future tax savings or other tax structuring possibilities in these Chapter 11 Cases.  The Tax Attributes may be of significant value to the Debtors and their estates because the Debtors can generally carry forward their Tax Attributes to offset their future taxable income, thereby reducing their future aggregate tax obligations.  In addition, such Tax Attributes may generally be utilized by the Debtors to offset any taxable income generated by transactions consummated during these Chapter 11 Cases.  The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

101.    Implementation of the Procedures is necessary and appropriate to enforce the automatic stay and, critically, to preserve the value of the Tax Attributes for the benefit of the Debtors' estates.  I am advised that under section 382 of the IRC, certain transfers of Common Stock prior to the consummation of the Chapter 11 Plan could cause the termination or limit the use of the Tax Attributes.  As stated above, as of the end of the Debtors' fiscal tax year ending December 31, 2019, the Debtors had federal NOL carryovers in the amount of approximately $443

---

and entities acting in concert to make a coordinated acquisition of equity securities may be treated as a single entity and (5) to the extent set forth in Treasury Regulations Section 1.382-4, a holder would be considered to beneficially own equity securities that such holder has an Option (as defined herein) to acquire). An "Option" to acquire stock includes all interests described in Treasury Regulations Section 1.382-4(d)(9), including any contingent purchase right, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

million and disallowed business interest carryforwards of approximately $31 million, which translate to the potential for material future tax savings (including in post-emergence years) or other potential tax structuring opportunities in these Chapter 11 Cases.  The termination or limitation of the Tax Attributes could be materially detrimental to all parties in interest.  Thus, granting the relief requested herein will preserve the Debtors' flexibility in operating their business during the pendency of these Chapter 11 Cases and also implementing an exit plan that makes full and efficient use of the Tax Attributes, maximizing the value of their estates.

102.    Additionally, the Procedures do not bar all transfers of Common Stock. The Debtors seek to establish the Procedures only to monitor those types of transactions that would pose a serious risk under the ownership change test pursuant to section 382 of the IRC or corresponding provisions of state law and to preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer could jeopardize the Debtors' utilization of the Tax Attributes. Because of the Tax Attributes' importance to the Debtors' restructuring, and consequently to all parties in interest, the benefits of implementing the Procedures outweigh subjecting a limited number of transfers to the Procedures.

103.    I believe that the relief requested in the Equity Trading Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest. Accordingly, I respectfully submit that the Equity Trading Motion should be approved.

104.    ***Application to Appoint Epiq as Claims and Noticing Agent.***  By this application, the Debtors seek entry of an order authorizing the appointment of Epiq as the Claims and Noticing Agent in these Chapter 11 Cases.  Upon information and belief, Epiq is an experienced claims agent and is frequently used by debtors in large chapter 11 cases, and I believe Epiq is well qualified to serve as the Claims and Noticing Agent in these Chapter 11 Cases.  The employment

of Epiq will provide the Clerk of the Court and the Debtors with efficient management of the claims and noticing processes in these Chapter 11 Cases, which will allow the Debtors' management and professionals to focus their attention more closely on the Debtors' overall chapter 11 efforts.

## **Conclusion**

105.    In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

*/s/ Lorne E. Phillips*
_____
Lorne Phillips
Executive Vice President and Chief Financial Officer