**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PIONEER ENERGY SERVICES CORP., *et al.*[1] | ) ) | Case No. 20-31425 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OBJECTION OF CREDIT SUISSE ASSET MANAGEMENT, LLC, DW PARTNERS, LP AND WHITEBOX ADVISORS LLC TO (I) CONFIRMATION OF THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF PIONEER ENERGY SERVICES CORP. AND ITS AFFILIATED DEBTORS AND (II) FINAL APPROVAL OF THE DISCLOSURE STATEMENT**
[Ref Doc. No. 16]

TO THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE:

Credit Suisse Asset Management, LLC, DW Partners, LP and Whitebox Advisors LLC, on behalf of their advised or managed accounts and/or funds that own 6.125% Senior Notes due 2022 (the "Notes") issued pursuant to that certain Indenture, dated as of March 18, 2014, by and among Pioneer, as the issuer, Wells Fargo, National Association, as Trustee, and the other guarantors party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Indenture")[2] (collectively, the "Objecting Noteholders") object (the "Objection") to confirmation of the *Joint Prepackaged Chapter 11 Plan of Reorganization of Pioneer Energy*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are as follows: Pioneer Energy Services Corp. (8619); Pioneer Coiled Tubing Services, LLC (6232); Pioneer Drilling Services, Ltd. (2497); Pioneer Fishing & Rental Services, LLC (4399); Pioneer Global Holdings, Inc. (4707); Pioneer Production Services, Inc. (1361); Pioneer Services Holdings, LLC (4706); Pioneer Well Services, LLC (7572); Pioneer Wireline Services Holdings, Inc. (6455); and Pioneer Wireline Services, LLC (2205). The headquarters for the above-captioned Debtors is 1250 N.E. Loop 410, Suite 1000, San Antonio, Texas 78209.

[2] *See* Second Amended Verified Statement of Davis Polk & Wardwell LLP and Haynes and Boone, LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019 (Doc. No. 243) (April 23, 2020) ("Second Amended 2019 Statement"), ¶ 4 & Ex. A.

*Services Corp. and its Affiliated Debtors* (Doc. No. 16-1) (the "Plan")[3] and the adequacy of the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization of Pioneer Energy Services Corp. and Its Affiliated Debtors* (Doc. No. 16-1), as supplemented (the "Disclosure Statement").  In support of the Objection, the Objecting Noteholders respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The world is a very different place than it was just two months ago.  The phrases "COVID-19" or "pandemic" were not even mentioned in the solicitation version of the Disclosure Statement that the Debtors distributed on February 28.  While there may have been public awareness of the coronavirus, our political, public health, and scientific leaders were cautiously optimistic that the U.S. would be spared the brunt of the virus, whereas today most of the country, not to mention much of the world, is on complete lockdown.  The situation we have all been living through over the past two months is unprecedented in United States history, certainly over the past hundred years.

2.      The unprecedented, sudden and overwhelming disruptions in our economy, nation, and world—which have been even more acute in the oil and gas markets—have fundamentally undermined the projections, assumptions and very foundation on which the Plan transactions were based.

3.      The Debtors' own revised April 1 projections—even if they were credited and were not unduly optimistic—prove the point.  As of February 28, the projections in the Debtors' Disclosure Statement ("February 28 Projections") estimated a 2020 EBITDA of $60.3 million,

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan (as defined below).

and a five-year cumulative EBITDA of $352.1 million.  The *Supplement to Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization* (Doc. No. 163-1) (the "Disclosure Statement Supplement") filed April 1, 2020, less than five weeks later, estimated a 2020 EBITDA that was **50% lower**.  Nor do the Debtors' own projections indicate that this will be a short-term phenomenon.  The Debtors' own revised April 1 projections in the Disclosure Statement Supplement (the "April 1 Projections") provide that **over the next five years** cumulative EBITDA will be **40% lower** than the February 28 Projections, cumulative net cash flow will be **53% lower**, and free cash flow will be **almost 70% lower**.  Those are the Debtors' own numbers as of April 1.  As described further below and in the accompanying Expert Report of Drew McManigle ("McManigle Report") (attached as Exhibit B hereto), even those dramatically reduced projections were unduly optimistic as of April 1, and are even more so today as circumstances continued to deteriorate significantly in the weeks following April 1.  In short, the deal struck on February 28 was based on projections and assumptions that no longer come close to reflecting the drastically changed world that we live in today and the drastically changed business and financial realities facing the Debtors.

4.      Given this new reality, the Plan should not and cannot be confirmed.  First, the Restructuring Support Agreement dated February 28, 2020 between the Debtors, the Consenting Noteholders, who were members of an ad hoc group (the "Ad Hoc Noteholder Group") of which the Objecting Noteholders are a part, and the Consenting Term Lenders (the "RSA") (attached as Exhibit C hereto) provides certain "Conditions Precedent to the Restructuring," and states that one "condition to the Plan Effective Date" is that the Plan, Disclosure Statement, and "any modifications, amendments or supplements thereto" be "acceptable to the Required Consenting Noteholders."  (RSA §§ 3.01, 3.02, Ex. B (Restructuring Term Sheet ("Conditions Precedent to

the Restructuring" item (v))).)    In other words, the RSA provides a flat consent right with respect to the Plan, the Disclosure Statement, and any amendments or supplements thereto.

5.      The Objecting Noteholders consented to, and their transactions with the Debtors were premised upon, the Disclosure Statement finalized on February 28, which incorporated the Debtors' projections as of that date.  Those projections, and the entire foundation upon which the transactions were based, are no longer remotely operative, as the Debtors' own Disclosure Statement Supplement is forced to admit.  Accordingly, the Plan and the Disclosure Statement, as supplemented by the Plan Supplement and Disclosure Statement Supplement, are not acceptable to the Objecting Noteholders.  *See Declaration of Houdin Honarvar in support of objection of DW Partners, LP* (attached as Exhibit D hereto) (hereinafter, the "Honarvar Declaration"); *Declaration of Jacob Mercer in support of objection of Whitebox Advisors LLC* (attached as Exhibit E hereto) (hereinafter, the "Mercer Declaration"); and *Declaration of Thomas Flannery in support of objection of Credit Suisse Asset Management, LLC* (attached as Exhibit F hereto) (hereinafter, the "Flannery Declaration"). Under the terms of the RSA, the Plan therefore cannot go effective because the consent of the Required Consenting Noteholders will be unachievable without the consent of the Objecting Noteholders.[4]

6.      In addition, it is a condition precedent to the Objecting Noteholders' obligation to fund the New Secured Bonds Commitments (as defined in the RSA) that the Plan and the

---

[4] "'Required Consenting Noteholders' means, as of the relevant date, Consenting Noteholders holding at least 66.67% of the aggregate outstanding principal amount of the Notes Claims that are held by all Consenting Noteholders."   (RSA at § 1.01.) The RSA was signed by members of the Ad Hoc Noteholder Group holding approximately 75.9% in the aggregate of the principal amount outstanding under the Notes, equal to approximately $228 million in aggregate outstanding principal amount.  (Disclosure Statement at 17.)  The Objecting Noteholders hold approximately $103 million of the aggregate outstanding principal amount of the Notes Claims, equal to approximately 45% of the Notes Claims held by all Consenting Noteholders.  (Second Amended 2019 Statement, ¶ 4 & Ex. A.)  Therefore, it is mathematically impossible to attain the consent of the "Required Consenting Noteholders"—66.67% of the aggregate outstanding principal amount of the Notes Claims that are held by all Consenting Noteholders—without the consent of the Objecting Noteholders, who hold approximately 45% of such claims.

Disclosure Statement, and all supplements and amendments thereto, be acceptable to the Required Consenting Noteholders. *See* (RSA § 11, RSA Ex. B (Restructuring Term Sheet ("Conditions Precedent to the Restructuring" at item (v))).) Since they are not acceptable to the Objecting Noteholders, the consent of the Required Consenting Noteholders is unachievable, and the Objecting Noteholders are not obligated to fund the New Secured Bonds Commitments. Thus, the Plan is not feasible and cannot be confirmed, as without the proceeds of the New Secured Bonds the Debtors will lack the funds needed to make the distributions contemplated under the Plan.

7.     Second, the Backstop Commitment Agreement between the Debtors and the Ad Hoc Noteholder Group dated February 28, 2020 (the "Backstop Commitment Agreement" or "BCA") (attached as Exhibit G hereto) provides that the obligation of each of the Objecting Noteholders to fund the purchase of the convertible notes allocated to it on the Plan Effective Date is subject to the condition precedent that "[s]ince the date hereof, there shall not have occurred, and there shall not exist, any change, event, circumstance, effect, development, occurrence or state of facts that constitutes, individually or in the aggregate, a Material Adverse Effect." (BCA § 11(l).) Material Adverse Effect ("MAE") is defined, in substance, as any "fact, event, change, effect, development, circumstance, or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on . . . the business, operations, properties, assets, prospects or financial condition of the Company and its subsidiaries." (BCA § 5(f).) Critically, unlike MAE provisions in many other contracts, the MAE provision here does not carve out events or circumstances that affect the market or the Debtors' industry as a whole, nor does it carve out COVID-19 or any other pandemics or similar public health issues. Because market carve-outs are typically included in MAE provisions, a

ruling in this case that the MAE provision was triggered would not have any impact on other contracts that contain the customary market carve-outs, not to mention those agreed to in recent months that specifically exclude COVID-19 or other pandemics or public health crises.

8.     While relief under an MAE provision is rarely granted, the circumstances of the past two months are unprecedented, and the Debtors cannot reasonably dispute that these events have had, and will continue to have, "a material adverse effect on . . . the business, operations, properties, assets, prospects [and] financial condition of the Company."  Counsel for the Debtors have attempted to defend the position that no MAE has occurred by arguing that the oil and gas markets are inherently volatile, and that the Objecting Noteholders knew this when they agreed to the Restructuring Transactions.   But the idea that the events of the past two months—and the far-ranging impacts the crisis has had and is expected to have going forward—can be analogized to reasonably anticipated "volatility in oil and gas prices" is, quite simply, not tenable.   The Objecting Noteholders respectfully submit that if a hundred people were asked whether the past two months were akin to reasonably anticipated volatility in oil and gas markets, not a single person would agree.   This has been a once-in-a-century event.   The legal question at issue is whether, under the plain terms of the contract, events or circumstances have occurred since February 28 that, individually or in the aggregate, have "had or would reasonably be expected to have" a material adverse effect on the Debtors.   The clear answer to that question is yes.   If the events of the past two months do not qualify as an MAE, it is difficult to imagine what would.

9.     The Debtors have also indicated that they plan to argue that there was no MAE because the impacts of the coronavirus could have been anticipated as of February 28.   This argument likewise is untenable.   The Debtors themselves did not anticipate the impacts of the coronavirus as evidenced by the fact that they did not mention COVID-19 or any risks associated

with pandemics in their solicitation version of the Disclosure Statement and have since had to cut their own February 28 financial projections by as much as 50%.  As of February 28, there was no expectation that the coronavirus would lead to an unprecedented crisis for the nation and the oil and gas industry, with most of the country confined to our homes.

10.     In sum, based on the plain terms of the governing MAE provision and the Debtors' own April 1 Projections—not to mention the undisputable facts that are before all of our eyes every day in these unprecedented times—the Objecting Noteholders respectfully submit that the conditions precedent to their funding obligations under Section 11(f) of the BCA have not been met and will not be met in the foreseeable future.  The Plan therefore cannot be consummated, is not feasible, and cannot be confirmed, as without the proceeds of the BCA transactions to be provided by the Objecting Noteholders, the Debtors will lack the funds needed to make the distributions contemplated under the Plan.  And despite the Debtors' expressed intention to rely on the fact that certain members and former members of the Ad Hoc Noteholder Group have indicated a willingness to close, their decision to do so—and any internal reasons that may have prompted this decision—has no bearing on the legal question presented to this Court of whether there has been a material adverse effect on the Debtors' business.

11.     While the Debtors' own April 1 Projections, standing alone, establish that an MAE has occurred, the analysis presented in the accompanying McManigle Report establishes that even these April 1 Projections are too optimistic, and that circumstances have continued to deteriorate rapidly since April 1, rendering even the April 1 Projections obsolete.  Based on current realities, even if, notwithstanding the MAE, the Objecting Noteholders were required to close, the Plan is not feasible.  As the McManigle Report explains, confirmation of the Plan

would likely be followed by further reorganization or liquidation, as the Debtors' survival after confirmation depends on their meeting the outdated and overly optimistic projections.

12.     Finally, because the April 1 Disclosure Statement Supplement used projections that are unrealistic and that have been superseded by the events of the past few weeks, the Disclosure Statement does not meet the adequacy requirement of Section 1125 and should not receive final approval.   After several requests from the Objecting Noteholders, the Debtors agreed on April 21, 2020 to provide further revised projections in advance of the May 5, 2020 confirmation hearing (the "<u>Confirmation Hearing</u>"), but they have not yet been provided.   The Objecting Noteholders reserve all rights with respect to the substance and reliability of these further revised projections and the timing of their receipt.

**BACKGROUND**

13.     As described in Pioneer's *Declaration of Lorne Phillips in Support of Chapter 11 Petitions and First Day Motions* (Doc. No. 20) ("<u>First Day Decl.</u>"), Pioneer is a provider of "land-based drilling services and production services" to its domestic and international customers.  First Day Decl. ¶ 8.  As a service provider to oil and gas exploration and production companies, Pioneer's performance is "closely linked to market trends in the oil and gas industry and, in particular, the volatility of oil and natural gas prices."   *Id.* ¶ 43.

14.     The Ad Hoc Noteholder Group collectively holds approximately $117 million (roughly 39%) of the Notes.  (Second Amended 2019 Statement ¶ 4 & Ex. A).  The members of the Ad Hoc Noteholder Group who are Objecting Noteholders are advisers to or managers of accounts or funds that collectively hold approximately $103 million of the same Notes, or roughly 34% of the amount outstanding.  *Id.*  Additionally, the Objecting Noteholders have committed to purchase up to approximately 49.94% of the new convertible notes backstopped by

the Backstop Parties (as defined in the BCA) pursuant to the terms and conditions set forth in the BCA.

15.     Around June 2019, as the Debtors' business began to experience negative headwinds, the Ad Hoc Noteholder Group formed, retained undersigned counsel, and began negotiating a potential restructuring transaction with the Debtors.  First Day Decl. ¶ 58; Second Amended 2019 Statement ¶ 1.  In the ensuing eight-month negotiation period leading up to the Petition Date, the Ad Hoc Noteholder Group and the Debtors continued to negotiate an in-court restructuring transaction and the Debtors eventually retained Alvarez & Marsal North America, LLC "to assist it in preparing for possible in-court restructuring proceedings" in October 2019.  First Day Decl. ¶¶ 58–59.

16.     The Ad Hoc Noteholder Group and the Debtors continued to negotiate with each other and with other stakeholders through the beginning of 2020 with a key outstanding issue being the severance agreements for Debtors' management team.  The Debtors, the Ad Hoc Noteholder Group, and other key stakeholders concluded these negotiations in February and ultimately executed the RSA and BCA on February 28, 2020.

17.     Based on the circumstances known as of late February, under the terms of the RSA and the BCA, the Ad Hoc Noteholder Group agreed to fulfill at least two critical roles in connection with the Debtors' restructuring.  *See* First Day Decl. ¶ 60.  First, the Ad Hoc Noteholder Group agreed to backstop substantially all of the $125 million rights offering of new unsecured convertible bonds.  *Id.*  Second, the Objecting Noteholders committed to purchase new secured bonds to be issued by reorganized Pioneer in the principal amount of $78.125 million.  The proceeds from this purchase, together with the proceeds from the sale of new unsecured convertible bonds, would pay off the Debtors' pre-petition term lenders at par plus

any prepayment premium and default interest, providing critical leverage relief for the reorganized Debtors and needed working capital on the balance sheet to support the Debtors post emergence.  First Day Decl. ¶¶ 60, 64.

18.    The parties' agreement was carefully reduced to writing in a series of related agreements, including chiefly the RSA and the BCA.  In reaching these agreements, the Parties outlined their respective commitments, which included numerous conditions precedent.

19.    The RSA provides that it is a condition precedent to the Plan going effective and to the obligation to fund the New Secured Bonds Commitments that all Definitive Documents, including the Plan and the Disclosure Statement, and any supplements thereto, be "in form and substance acceptable" to the Required Consenting Noteholders.  RSA §§ 3.01, 3.02, 11, Ex. B (Restructuring Term Sheet ("Conditions Precedent to the Restructuring" at item (v)).

20.    The parties also specifically agreed that it is a condition precedent to funding under the BCA that there "shall not exist, any change, event, circumstance, effect, development, occurrence or state of facts that constitutes, individually or in the aggregate, a Material Adverse Effect."  Backstop Commitment Agreement § 11(l).  The Backstop Commitment Agreement defines a "Material Adverse Effect" as:

> any fact, event, change, effect, development, circumstance, or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on, and/or material adverse developments that would reasonably be expected to result in a material adverse effect with respect to: (i) the business, operations, properties, assets, prospects or financial condition of the Company and its subsidiaries, in each case, taken as a whole; or (ii) the ability of the Company or any of its subsidiaries, in each case taken as a whole, to perform their obligations under this Agreement, the Plan and the RSA; provided, that, for the purposes of clause (i), none of the following, either alone or in combination, will constitute a Material Adverse Effect: (A) any changes in applicable Laws (as defined in the RSA) or United States generally accepted accounting principles ("GAAP"); (B) any change resulting from the filing or pendency of or emergence from the Chapter 11 Cases, actions taken in connection with the Chapter 11 Cases, or from any action approved by the Bankruptcy Court; (C) any change

10

resulting from the public announcement of the Chapter 11 Cases or the entry into this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated hereby; (D) any change resulting from the taking of any action taken by the Company and its subsidiaries after the date hereof with the prior consent of the Required Commitment Parties; (E) any effects or changes arising from or related to the breach of this Agreement by any Backstop Parties; or (F) any fact, event, change, effect, development, circumstance, or occurrence publicly disclosed by the Company in any filing with the SEC prior to the date hereof."  BCA § (5)(f).

21.     Following execution of the RSA and Backstop Commitment Agreement, the Debtors filed for chapter 11 protection on March 1, 2020, with a pre-packaged plan of reorganization.  The first day filings also included the February 28 Projections, as Exhibit F to the Disclosure Statement.  The Debtors specifically represented that the February 28 Projections were <u>the</u> proof that the restructuring was "feasible":  "Based upon the [February 28] Projections, the Debtors believe that the Reorganized Debtors will be able to make all payments required pursuant to the Prepackaged Plan, and therefore, that confirmation of the Prepackaged Plan is not likely to be followed by liquidation or the need for further reorganization."  *Id.*  The Debtors further explained that the February 28 Projections were "prepared based on the level of expected spending in the energy industry—which is heavily influenced by the current and expected future prices of oil and natural gas.  Changes in expenditures result in an increased or decreased demand for products and services.  Rig activity is an indicator of the level of spending for the exploration and production of oil and natural gas reserves."  February 28 Projections (Doc. No. 16-1) at 4-5.  As reflected in Figure 1, drawn directly from the February 28 Projections, as of February 28, 2020, the Debtors expected revenue and EBITDA growth over five years, culminating in $576.7 million in total revenue for 2024 and $82.3 million in EBITDA for that year.

22.   *Figure 1: February 28 Projections*

| Reorganized Debtors Projected Income Statement | | | | | | |
|---|---|---|---|---|---|---|
| | Fiscal Year Ending December 31, | | | | | |
| ($ in millions) | 2020 | 2021 | 2022 | 2023 | 2024 | FN |
| Total Revenues | $ 514.7 | $ 531.8 | $ 543.9 | $ 557.9 | $ 576.7 | |
| Operating Cost | 384.1 | 394.6 | 401.4 | 408.4 | 418.1 | |
| **Gross Margin** | **130.7** | **137.2** | **142.5** | **149.6** | **158.6** | |
| *Gross Margin %* | *25.4%* | *25.8%* | *26.2%* | *26.8%* | *27.5%* | |
| General and Administrative Expense | 70.4 | 71.8 | 73.3 | 74.7 | 76.2 | |
| Depreciation And Amortization | 48.6 | 33.4 | 38.6 | 44.0 | 49.9 | [1] |
| **EBIT** | **11.7** | **32.0** | **30.6** | **30.8** | **32.5** | |
| Interest Expense | 17.6 | 15.9 | 16.2 | 16.5 | 16.9 | |
| Income Tax Expense (Benefit) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | |
| Reorganization Items | 23.7 | - | - | - | - | |
| **Net Income / (Loss)** | **$ (31.6)** | **$ 14.1** | **$ 12.5** | **$ 12.3** | **$ 13.6** | |
| Depreciation And Amortization | 48.6 | 33.4 | 38.6 | 44.0 | 49.9 | [1] |
| Interest Expense | 17.6 | 15.9 | 16.2 | 16.5 | 16.9 | |
| Income Tax Expense (Benefit) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | |
| Reorganization Items | 23.7 | - | - | - | - | |
| **EBITDA** | **$ 60.3** | **$ 65.4** | **$ 69.2** | **$ 74.8** | **$ 82.3** | |

Note:
  [1]  Forecast reflects the estimated impact of Fresh Start Accounting adjustments expected to be implemented upon exit
        from Chapter 11

23.   On March 2, 2020, Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Prepackaged Plan; (II) Conditionally Approving Disclosure Statement; (III) Approving Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Conditionally (A) Directing the United States Trustee not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities; (VII) Approving Rights Offering Procedures; and (VIII) Granting Related Relief* (Doc. No. 19)

(March 2, 2020) (the "Solicitation Motion"), seeking limited relief from section 1125(b) of the Bankruptcy Code solely for the purposes of permitting the Debtors to solicit acceptance of the Plan from certain creditors and conduct the rights offering of the convertible notes. Solicitation Motion ¶ 31. In the Solicitation Motion, Debtors explicitly stated that they were "not requesting that entry of the [order approving the Solicitation Motion] be a determination as to the adequacy of the Disclosure Statement." Solicitation Motion ¶ 32. "Rather, such approval will be sought at the Confirmation Hearing and all parties' rights to object to the adequacy of the Disclosure Statement (subject to and in accordance with the deadlines and procedures otherwise set forth in the [order approving the Solicitation Motion]) are reserved." *Id.* On the same day, the Court entered an order (Doc. No. 81) (March 2, 2020) (the "Solicitation Order"), which conditionally approved the Disclosure Statement as having adequate information as required by section 1125 of the Bankruptcy Code without prejudice to any party in interest objecting to the Disclosure Statement at the Confirmation Hearing. Solicitation Order ¶ 10.

24.     As of February 28, the public was carefully watching the outbreak of the novel coronavirus disease that had, on February 11, been named COVID-19. A US Centers for Disease Control and Prevention statement of February 28 noted that "COVID-19 is not recognized to be spreading in U.S. communities," and that there were 53 confirmed cases in the United States (as compared to over 76,000 reported cases in mainland China).[5] The Disclosure Statement did not mention COVID-19 or identify any risks COVID-19 might pose to the Debtors or their reorganization prospects.

---

[5] Daniel B. Jernigan, *Update: Public Health Response to the Coronavirus Disease 2019 Outbreak — United States, February 24, 2020*, 69 Morbidity and Mortality Wkly. Rep. 216, 216-19 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6908e1-H.pdf.

25.     Two weeks after the Debtors filed the February 28 Projections in connection with their chapter 11 petitions, the World Health Organization defined COVID-19 as a pandemic.[6] Sixteen days after the RSA and BCA were executed, President Trump declared a national emergency in response to the COVID-19 outbreak in the United States.[7]  In the third week of March, states throughout the country began to impose stay-at-home orders which left the vast majority of the United States (like many other nations around the world) under quarantine.  *See* McManigle Report ¶ 25.  The collapse in the demand for oil as a result of the pandemic has led to a historic decline in the price of oil that is expected to last for years.  *Id.* at ¶ 30.  Indeed, the CEO of Schlumberger described present circumstances as a "double black swan event [that] created simultaneous shocks in oil supply and demand resulting in the most challenging environment for the industry in many decades." *Id.* at ¶ 83.

26.     Separately, and compounding the problems for the oil and gas industry even further, around the same time that the coronavirus pandemic began to unfold, and one week after the RSA and BCA were executed, the Organization of the Petroleum Exporting Countries ("OPEC") and a group of oil production nations led by Russia failed to reach an agreement on oil production cuts.  *Id.* ¶ 30.  While a tentative temporary agreement was subsequently reached between OPEC and other countries to reduce oil production, prices for oil have not recovered, and instead have plummeted to never-before-seen depths even in light of an anticipated cut in supply. *Id.*

---

[6] *See WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 March 2020*, W.H.O.  (Mar.  11,  2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[7] Proclamation No. 994, 85 Fed. Reg. 15337 (Mar. 13, 2020).

27.     On April 1, the Debtors filed—without the consent or approval of the Ad Hoc Noteholder Group—their April 1 Projections.  *See Emergency Motion for Entry of an Order Conditionally Approving Supplement to Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization* (Doc. No. 163) (April 1, 2020) (the "Emergency Motion to Supplement") ¶ 6(ii), (iii).

28.     The new projections show a brutal collapse in the Debtors' prospects as compared to the February 28 Projections.  Even the Debtors' best case scenario—their "Case A"—shows a 50% decline in EBITDA for 2020 and 2021.  Disclosure Statement Supplement, "Case A." However, Case A is based on unreliable analyst "consensus" pricing, rather than "Strip" pricing, which is widely recognized to be the proper metric.  The Debtors' Case B, based on Strip pricing, shows an even more irretrievable decline in the Debtors' prospects throughout the five-year projection period.

*Figure 2: Comparison of Projected Income Statements from February 28 Projections to "Case B" of April Projections*



Financial Projections - Case B
($ Millions USD)

Reorganized Debtors Projected Income Statement

| ($ in millions) | Fiscal Year Ending December 31, | | | | | FN |
|---|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2023 | 2024 | |
| Total Revenues | $ 514.7354.9 | $ 531.8382.1 | $ 543.9420.0 | $ 557.9444.7 | $ 578.7459.4 | |
| Operating Cost | 384.1274.0 | 394.6291.2 | 401.4317.2 | 408.4332.3 | 418.1338.6 | |
| Gross Margin | 130.780.9 | 137.290.9 | 142.5102.8 | 149.6112.4 | 158.6120.8 | |
| *Gross Margin %* | 25.422.8% | 25.823.8% | 26.224.5% | 26.825.3% | 27.526.3% | |
| General and Administrative Expense | 70.452.0 | 71.857.5 | 73.361.2 | 74.762.4 | 76.263.7 | |
| Depreciation And Amortization | 48.649.2 | 33.432.0 | 38.634.9 | 44.038.2 | 49.941.6 | [1] |
| EBIT | 11.7(20.4) | 32.01.4 | 30.66.7 | 30.811.8 | 32.515.5 | |
| Interest Expense | 17.621.0 | 15.919.0 | 16.219.3 | 16.519.7 | 16.920.1 | |
| Income Tax Expense (Benefit) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | |
| Reorganization Items | 23.720.0 | | | | | |
| Net Income / (Loss) | $ (31.663.4) | $ 14.1(19.6) | $ 12.5(14.7) | $ 12.3(9.9) | $ 13.6(6.5) | |
| Depreciation And Amortization | 48.649.2 | 33.432.0 | 38.634.9 | 44.038.2 | 49.941.6 | [1] |
| Interest Expense | 17.621.0 | 15.919.0 | 16.219.3 | 16.519.7 | 16.920.1 | |
| Income Tax Expense (Benefit) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | |
| Reorganization Items & Other | 23.721.5 | - | - | - | - | |
| EBITDA | $ 60.330.3 | $ 65.433.4 | $ 69.241.6 | $ 74.849.9 | $ 82.357.2 | |

Note:

[1] Forecast reflects the estimated impact of Fresh Start Accounting adjustments expected to be implemented upon exit from Chapter 11

29.     In the weeks after the April 1 Projections, the situation for the Debtors and the oil and gas industry precipitously declined even further. *See* McManigle Report ¶¶ 31-37. The price of WTI futures contracts continued to decline to unimaginable depths, even heading for a short time into significantly *negative* territory such that sellers had to pay buyers to take their oil. *Id.* at ¶ 31. The WTI futures curve in recent weeks projected substantial declines to the future price of oil even relative to April 1. *Id.* at ¶ 54. The Debtors' customer base radically slashed their capital expenditure budgets even further, and the number of rigs continued their steep decline. *Id.* at ¶ 83-4. As described in the accompanying McManigle Report, the Debtors' April 1 Projections, which were unrealistically optimistic even at the time they were issued, became facially unachievable. *Id.* at ¶¶ 19, 82-86. Unfortunately, in view of these developments, as Mr. McManigle opines based on his decades of experience in the oil and gas industry, even if the

16

Plan were to be confirmed it would likely be followed by further reorganization or liquidation, and therefore the Plan is not feasible. *Id.* at ¶ 90.

30.     In light of the ongoing dramatic turn of events in the weeks since the Debtors issued their April 1 Projections, the Objecting Noteholders requested the Debtors to provide further updated projections.  On April 21, 2020, counsel for the Debtors agreed to do so in advance of the May 5, 2020 Confirmation Hearing, but those updated projections have not yet been received.

## ARGUMENT

31.     Pursuant to section 1129(a) of the Bankruptcy Code, a court may confirm a plan of reorganization only if it complies with the applicable provisions of the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a).   The Debtors, as plan proponents, bear the burden of proving all confirmation requirements by a preponderance of the evidence.  *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. Ltd., II*, 994 F.2d 1160, 1164-65 (5th Cir. 1993).

32.     Among other Section 1129 requirements, the Debtors must demonstrate that the plan is feasible, that is, that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization" of the Debtors.   11 U.S.C. § 1129(a)(11).   To meet this burden, the Debtors must demonstrate at least a "reasonable assurance of commercial viability," *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. Ltd., II (In re Briscoe Enters. Ltd., II)*, 994 F2d 1160, 1164-65 (5th Cir. 1993), and that the transactions contemplated under the plan "can be done as a practical matter under the facts," *In re CRB Partners*, LLC, No. 11-11924-CAG, 2013 WL 796566, at *7 (Bankr. W.D. Tex. Mar. 4, 2013) (citing *In re M & S Assocs., Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992).  Courts in the Fifth Circuit commonly evaluate feasibility against a six-factor test, under which the court considers "(1) the adequacy of the debtor's capital structure; (2) the earning power of the

debtor's business; (3) economic conditions; (4) the ability of the debtor's management; (5) the

probability of the continuation of the same management; and (6) and any other related matter

which determines the prospects of a sufficiently successful operation to enable performance of

the provisions of the plan." *In re Save our Springs (S.O.S.) Alliance, Inc.*, 632 F,3d at 173 n.6

(quoting *In re M & S Assocs., Ltd.*, 138 B.R. at 849).

33.     A proposed plan of reorganization is <u>not</u> feasible—and may not be confirmed—

when the debtors lack funding necessary to consummate the transactions contemplated under the

plan, when the plan cannot be carried out as designed, when economic conditions have suffered a

unprecedented downturn, and when the Debtors' earning power and business prospects have

precipitously declined.  *See In re Swiftco, Inc.*, No. 85-07083-H1-5, 1988 WL 143714, at *7–8

(Bankr. S.D. Tex. Oct. 5, 1988) (denying plan confirmation where the value of the company

severely declined since the time of filing the case and where the debtor's projections about its

income, expenses and available excess cash were so speculative that the court "cannot put

credence in them"); *In re CRB Partners, LLC,* No. 11-11915-CAG, 2013 WL 796566, at *8–9

(Bankr. W.D. Tex. Mar. 4, 2013) (finding a plan not feasible, *inter alia*, because the sources of

the liquidating fund were too uncertain); *In re M & S Assocs., Ltd.*, 138 B.R. at 852 (denying

confirmation where the debtor could not realistically repay the principal indebtedness under the

plan, and where the debtor relied on "the long shot possibility of a drastic improvement in the

real estate market.").

34.     The Bankruptcy Code also requires that creditors to be solicited for votes to

accept or reject a plan be provided with a disclosure statement containing "adequate

information," which is information "that would enable a hypothetical investor of the relevant

class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).  Where, as here,

final approval of disclosure statement is deferred to a confirmation hearing, the fact that a disclosure statement was granted conditional approval for solicitation does not in any way waive objections to a disclosure statement or reduce the Debtors' burden to demonstrate that their disclosure statement contains "adequate information."   Bankruptcy Local Rule 3016-2 ("The failure to object to a request for conditional approval [of a disclosure statement] does not constitute a waiver of any objection to the final approval of a disclosure statement or confirmation of a proposed plan.").

## I.   The Plan Is Not Feasible and Cannot Be Confirmed

35.   The Plan cannot be confirmed because it is not feasible.   First, the Plan is premised on transactions that cannot and will not be consummated, because the conditions precedent for the transactions under the RSA and BCA cannot and will not be satisfied.   Second, the Plan is premised on outdated, overly optimistic projections that fail to take into account market realities which reflect that, even if the Objecting Noteholders were required to close the RSA and BCA transactions, confirmation of the Plan would likely be followed by either further reorganization or liquidation of the Debtors.

### A.   The RSA Grants the Objecting Noteholders Flat Consent Rights Over the Plan and Disclosure Statement, and All Supplements Thereto, Which Are Not Acceptable Given the Unprecedented Events Since the RSA Was Signed

36.   Based on the plain language of the RSA, the Plan cannot go effective if "Definitive Documents" such as the Plan and the Disclosure Statement and their amendments or supplements, are not "acceptable" to the "Required Consenting Noteholders." (RSA §§ 3.01, 3.02, Ex. B (Restructuring Term Sheet ("Conditions Precedent to the Restructuring") at item (v).)   As described above, without the consent of the Objecting Noteholders, the consent of the Required Consenting Noteholders cannot be achieved.  *See* ¶ 5, *supra*.

37.     Sections 3.01 and 3.02 of the RSA give the Ad Hoc Noteholder Group unqualified consent rights over "Definitive Documents," which are defined to include the Plan, the Disclosure Statement, and "any modifications, amendments or supplements thereto."  RSA §§ 3.01, 3.02.  Section 3.02 provides that such documents must be "in form and substance acceptable to the Company Parties and the Required Consenting Noteholders."  The Restructuring Term Sheet dated February 28, 2020, which is attached as Exhibit B to the RSA and is expressly made part of the agreement,[8] likewise states, under the heading "Conditions Precedent to the Restructuring," that "[i]t shall be a condition to the Plan Effective Date" that "each of the Definitive Documents shall be in form and substance acceptable or reasonably acceptable (as applicable in accordance with Section 3.02 of the RSA) to the Company Parties and to the Required Consenting Noteholders."  RSA Ex. B (Restructuring Term Sheet ("Condition Precedent to the Restructuring") item (v)); *see* Plan (Disclosure Statement Ex. A) § IX(B)(5) (condition precedent to the Effective Date that "the Restructuring Documents [including the Plan and Disclosure Statement] shall be in form and substance acceptable or reasonably acceptable (as applicable in accordance with Section 3.02 of the Restructuring Support Agreement) to the Debtors and the Required Consenting Stakeholders in accordance with the consent rights in the Restructuring Support Agreement . . . .").

38.     Likewise, Section 11 of the RSA states that "it is acknowledged and agreed that the commitment provided hereunder is subject only to the express conditions precedent set forth under 'Conditions Precedent to the Restructuring' in the Term Sheet."  Again, one of those

---

[8] RSA § 1.01 ("'[RSA]' has the meaning set forth in the preamble hereto and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached hereto in accordance with Section 15.02 (including the Term Sheet).").

conditions is that the Plan, the Disclosure Statement, and all supplements thereto be acceptable to the Required Consenting Noteholders.  *See* ¶¶ 36-37, *supra*.

39.     Unlike other portions of RSA § 3.02, the Noteholders' consent right with respect to the Plan, the Disclosure Statement, and all supplements thereto is not qualified—it is a flat consent right—but even if it were qualified, the Objecting Noteholders' decision to withhold consent would be more than reasonable.  The Objecting Noteholders consented to *and the transactions were premised on* the Disclosure Statement filed on February 28, which incorporated the Debtors' projections as of that date.  Those projections were the basis for the entire deal.  But those projections declined by 40-50% or more in four weeks, and the outlook is far worse now than it was on April 1.  *See infra* ¶¶ 45-57.  In short, this is a very different company and a very different deal than the one the parties agreed to on February 28, and under the plain terms of the RSA's consent provision, because the Definitive Documents are not acceptable to the Objecting Noteholders, the Objecting Noteholders are not required to close, and therefore the Plan is not feasible and cannot go effective.

    **B.**    **The Unprecedented Events of the Past Two Months Have Had Material Adverse Effects on the Debtors, and Therefore A Condition Precedent to Closing the Restructuring Transactions Has Not Been Satisfied**

        **1.**    **The Material Adverse Effect Provision Applies, and Unlike Most MAE Provisions, Does Not Carve Out Circumstances that Affect the Industry As A Whole**

40.     Section 11 of the BCA provides that "[t]he obligations of the Commitment Parties to purchase Rights Offering Securities, Unsubscribed Securities and Management Commitment Securities, as applicable, pursuant to their respective Commitments on the Plan Effective Date are subject to satisfaction of" certain conditions.  One of those conditions is that "[s]ince the date hereof, there shall not have occurred, and there shall not exist, any change, event, circumstance,

effect, development, occurrence or state of facts that constitutes, individually or in the aggregate,

a Material Adverse Effect."  (BCA § 11(l).)

41.     Section 5(f) of the BCA defines "Material Adverse Effect," in pertinent part, to

mean:

> "any fact, event, change, effect, development, circumstance, or
> occurrence that, materially or in the aggregate, has had or would
> reasonably be expected to have a material adverse effect on, and/or
> material adverse developments that would reasonably be expected
> to result in a material adverse effect with respect to: (i) the
> business, operations, properties, assets, prospects or financial
> condition of the Company and its subsidiaries, in each case taken
> as a whole; or (ii) the ability of the Company or any of its
> subsidiaries, in each case taken as a whole, to perform their
> obligations under this Agreement, the Plan and the RSA."

42.     Like virtually all MAE provisions, section 5(f) then sets forth a number of carve-

outs, providing that "for the purposes of clause (i), none of the following, either alone or in

combination, will constitute a Material Adverse Effect."  *See supra*, ¶ 20.  None of the carve-outs

are relevant here.

43.     Critically, *unlike* most MAE clauses, the one agreed to by the parties here does

*not* contain the typical carve-outs for events that affect the industry or the economy as a whole,

and that are not idiosyncratic to the company signing the contract.  Counsel for the Debtors and

the Term Lenders themselves have acknowledged that exclusions of this type are common or

typical in MAE clauses entered into by commercial counterparties.  *See Is the Coronavirus a*

*Material Adverse Effect?*, Paul Weiss, 1 (Mar. 6, 2020), https://www.paulweiss.com/media/

3979392/6mar20-maedocx.pdf (attached hereto as Exhibit H) ("Common exclusions from the

MAE definition include effects related to (i) general economic, business, financial, credit or

other market conditions and (ii) any epidemic or other natural disaster or act of God, but often

only to the extent such effects do not disproportionately adversely affect the subject party versus

others in the industry."); *Key Considerations During COVID-19 Pandemic and Market Disruption*, Vinson & Elkins LLP, 25 (Mar. 26, 2020), https://media.velaw.com/wp-content/uploads/2020/03/26150450/Key-Considerations-During-COVID-19-Pandemic-and-Market-Disruption-03-26-2020.pdf (attached hereto as Exhibit I) ("An MAE definition typically excludes various economic, market, industry, political and other general categories of risk . . . .").

44. Because the governing contract here contains no such carve-outs, in order to establish that there was an MAE, the Objecting Noteholders need not show that the impact of the coronavirus pandemic, along with the accompanying devastation in the oil and gas industry, was or is in any way unique to the Debtors. Rather, under the plain terms of the contract, the question is simply whether, between the time the transactions were entered into on February 28 and the date that the Plan was to become effective, there existed "any fact, event, change, effect, development, circumstance, or occurrence that, materially or in the aggregate, has had or would reasonably be expected to have a material adverse effect on, and/or material adverse developments that would reasonably be expected to result in a material adverse effect with respect to . . . the business, operations, properties, assets, prospects or financial condition of the Company." BCA § 5(f).[9] For the reasons set forth below, the Objecting Noteholders respectfully submit that there can be little doubt that this standard has been met.

---

[9] An MAE also exists if there has been a materially adverse effect on "the ability of the Company . . . to perform [its] obligations under [the BCA], the Plan and the RSA," but the test is disjunctive, not conjunctive. *See* BCA § 5(f) (MAE can be based on any of the effects listed in clause (i) "or" (ii)).

2.      **The Historically Unprecedented Events of the Past Two Months, and their Dramatic Effects on the Debtors' Business, Satisfy the BCA's MAE Test**

a.      *The Devastating Events Since February 28, 2020*

45.      While the existence of the coronavirus, as well as downward pressure on oil and gas prices, were known as of February 28, and while the stock market had already shown vulnerability and volatility after an historically long bull market, the nature, scope and extent of the crisis that was about to unfold was not known or anticipated by the Debtors or the Objecting Noteholders.  That may explain why the Debtors did not negotiate for a carve-out from the MAE based on the COVID-19 epidemic or other broadly applicable carve-outs relating to events that affect the larger market and economy and are not idiosyncratic to the Debtors.

46.      Indeed, in the RSA itself the Debtors made a representation and warranty that "[a]s of the date hereof, since [September 30, 2019][10], no change, event, circumstance, effect, development, occurrence or state of facts has occurred or exists that has or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect."  RSA § 5(m).  The Debtors would have breached that representation if there had already been a Material Adverse Effect on their business as a result of COVID-19 or downward pressure on oil and gas prices by February 28, 2020.

47.      To the contrary, the tsunami unleashed upon the United States by the COVID-19 pandemic, which was felt even more severely in the oil and gas markets than in the economy as a whole, happened in the weeks following February 28, and accelerated with the initiation of statewide quarantines throughout the country beginning in the second half of March.  Perhaps the

---

[10] The "Reference Date" is defined by sections 5(h) and (i) of the BCA as the date of the most recent balance sheet presented in the Financial Statements, the most recent being the 10-Q for the quarter ended September 30, 2019.

most obvious evidence of this fact is that the Debtors' Disclosure Statement did not say a single word about the COVID-19 epidemic, much less did it say that virtually the entire United States was quarantined in their homes—because none of that had happened yet.  Indeed, the Debtors identified providing "supplemental disclosure regarding risks associated with the recent coronavirus (COVID-19) outbreak" as one of the reasons that it filed the Disclosure Statement Supplement on April 1.  Disclosure Statement Supplement, at 5.

48.     The speed and intensity of the impact of the COVID-19 pandemic, and the accompanying lockdown of the United States, was as unexpected and dramatic as anything the United States had previously experienced.  The speed by which new unemployment claims were filed in the weeks following February 28 is one of many measures demonstrating this fact.  In the week ending February 29, 2018—the day after the RSA was signed—there were 217,608 initial unemployment claims (as compared with 220,583 claims as of the same week the prior year). *See* McManigle Report, at ¶ 25.   By the week ending March 14, 2020—just six weeks ago, and two weeks <u>after</u> the RSA was signed—initial unemployment claims were at approximately 282,000.  *Id.*  Then, in the following week ending March 21, 2020, as stay-at-home orders began to take hold, there were **3,307,000** initial claims—more than a **ten-fold** increase.  *Id.*  The number of initial unemployment claims increased by over 3 million in one week.  For the following week ending March 28, there were **6,867,000** initial claims—another increase of over 3.3 million initial unemployment claims in one week, and over **twenty-four times** as many as there were just two weeks earlier.  *Id.*  There have been over **twenty-two new million initial unemployment claims** from mid-March 2020 through April 16, 2020, or roughly 13.5% of the entire labor force of the United States. *Id.* at ¶ 26.  To put these staggering numbers into perspective, from the peak to the trough of the Great Recession (a two-year period from

November 2007 to December 2009), employment declined by 8.6 million workers, a small fraction of the number of workers who have filed unemployment claims in a period of about four weeks. *Id.*

49.     The devastation of recent weeks has been experienced even more acutely in the oil and gas industry.  Crude prices have plummeted for two reasons:  as a direct result of a collapse in demand due to COVID-19—an impact likely to be felt for some time with the prospects of successive waves of quarantines, not to mention the longer term impact on the economy caused by the pandemic—as well as a direct result of the continued price war between Saudi Arabia and Russia.  *See* McManigle Report, at ¶ 30.  On the date the RSA was signed, February 28, 2020, the crude oil spot price closed at $44.83/bbl, and the average WTI crude price from January 1 to February 28, 2020 was $54.21/bbl.   *Id.* at ¶ 31.  Since that time, from February 28 through April 23, WTI crude pricing has averaged $24.22/bbl, a **55% decrease** relative to the prior 2020 period.  *Id.*  Oil futures contracts have plummeted to unimaginable depths, including at times being in *negative* territory.  *Id.* at ¶¶ 36-38.

50.     This dramatic decline in oil prices is not expected to be a short-term phenomenon.  As of April 21, the WTI Futures Curve reflects the market's view that the price of WTI crude for 2020 will be **75.2% lower** relative to the futures curve for 2020 as of February 28.  *See* McManigle Report, at ¶ 54.  And between April 1 and April 21 alone, the WTI Futures Curve for 2020 has dropped **53%**.  *Id.*  The significant effects on the futures curve continues into future years.  For 2021, the futures curve as of April 21 is down 33.4% relative to where it was on February 28, and is down 26.5% for 2022, with effects continuing to be felt throughout the five-year projection period.  *Id.*  This demonstrates that there is market consensus for a sustained and prolonged, depressed oil pricing environment as opposed to a brisk recovery.

51.     The collapse of oil and gas prices over the past two months and market expectations that prices will remain depressed over an extended period has led to a severe slashing of capital expenditure ("<u>capex</u>") budgets among the U.S. exploration and production ("E&P") companies which constitute the Debtors' customer base.  This will in turn have materially adverse impacts on the Debtors' business.  *See* McManigle Report, at ¶¶ 44-45.  For a selection of Debtors' current and potential customers, capex budgets are on pace to decline 34% year over year.  *Id.* at ¶ 44.  For a selection of the Debtors' key E&P customers, capex budgets for 2020 are on pace for an even greater decline of 48% year over year, an approximately 39% additional decline as compared to these customers' prior forecasts.  *Id.* at ¶ 45, Tables 1, 2.   On April 20, Halliburton's President, CEO, and Chairman commented on an earnings call that "North American E&P CapEx is trending towards a 50% reduction year-on-year in 2020."  *Id.* at Appendix G, p. 79.

52.     Further, since February 28 there has been a precipitous decline in rotary rig counts.  *See* McManigle Report, at ¶ 46.  Drilling is a critical and outsized contributor to the Debtors' financial results:  drilling accounts for approximately 29% of their projected revenue and 70% of their projected pre-corporate EBITDA.  *Id.* at ¶ 46, 48.  As of April 24, the United States Rotary Rig Count has declined about 41% relative to February 28, and is expected to tumble further.  *Id.*   This is another materially adverse effect on the Debtors' business.

53.     With respect to the particular E&P companies who constitute the Debtors' key customers, they have been affected enormously by the events of the past two months, which in turn will have significantly damaging effects on the Debtors' business and financial prospects.  *See* McManigle Report at ¶ 45.  As an indication of the precarious situation of the Debtors' customers, the stock prices of the companies identified by the Debtors as "key customers" have

dropped 39% from February 28 to April 21 (with many dropping 60-70% or more), relative to a 7% decline in the S&P 500 during that same period.  *Id.* at ¶ 50.

54.     Pioneer's E&P customers are also likely to continue to slash capex budgets as current commodity prices are below break-even levels in most shale plays—and, based on current strip pricing, will remain below break-even levels through 2023.  McManigle Report at ¶ 49.  Indeed, current estimates show that the lowest break-even crude oil prices are seen in the Permian Basin, at around $48/bbl.  *Id.*  The current strip price does not approach $48/bbl in the foreseeable future.  *Id.*  It is no surprise that, in this environment, one of Pioneer's key customers, Whiting Petroleum Corp., filed for bankruptcy on April 1, 2020.  *Id.* at ¶ 83.  Additional bankruptcies may well follow, which will further damage the Debtors' liquidity and ability to meet its projections.  *Id.* at ¶¶ 72-73, 85.  On April 16, following the filing of Whiting Petroleum's bankruptcy case, Pioneer's CEO stated in a *Bloomberg* article about the collapse of the oilfield service industry that Pioneer was abandoning drilling in the Bakken shale basin, and was quoted as saying, "[w]hen the big ones fall, that's really pretty catastrophic."[11]

    b.     *The Debtors' Own Revised Projections As of April 1, 2020 Establish that Material Adverse Effects Have Occurred.*

55.     The Debtors' own April 1 Projections prove that the circumstances that unfolded after this deal was struck have had material adverse effects on the Debtors.

56.     The February 28 Projections, on which the deal was based, estimated a 2020 EBITDA of $60.3 million, a five-year cumulative EBITDA of $352.1 million, and a five-year cumulative cash flow of $73.9 million.  *See* McManigle Report, at ¶ 57.  As described below, the

---

[11] David Wethe, *Oil's Collapse Is Taking an Entire Service Industry Down With It*, Bloomberg (Apr. 16, 2020, 7:30 AM), https://www.bloomberg.com/news/articles/2020-04-16/oil-s-collapse-is-taking-an-entire-service-industry-down-with-it.

Debtors' April 1 Projections show a dramatic decline in these metrics not only for 2020 but over the entire five-year projection period.  *See* McManigle Report at ¶ 80.

57.     The Debtors' April 1 Projections contained two sets of projections.  "Case A," according to the Debtors' Disclosure Statement Supplement, "is based, in part, on recent estimated future oil prices that approximate forecasts from securities analysts for oil prices for years 2021 through 2024, as reported to Factset, a financial data services provider"—i.e., analyst "consensus" pricing.  Disclosure Statement Supplement, at Ex. F; McManigle Report, at ¶ 58. Case B "is based, in part, on recent estimated future oil prices that approximate oil futures contracts, as quoted by the New York Mercantile Exchange for the same periods"—i.e., "Strip" pricing.  Disclosure Statement Supplement, at Ex. F; McManigle Report, at ¶ 58.   Nevertheless, both Case A and B projections prove that there has been a material adverse effect on Debtors.

58.     As this Court is well aware, Strip pricing is real market evidence—it shows what real buyers and sellers in the futures market predict, backed by real money.  *See* McManigle Report, at ¶ 60. It is well established that Strip pricing is the more reliable measure than analyst "consensus" pricing:

- As observed by Judge Stuart M. Bernstein of the SDNY Bankruptcy Court in *Breitburn Energy*, the general acceptance of Strip pricing is confirmed by various third party sources, including the Society of Petroleum Evaluation Engineers ("SPEE") and has been used to value assets in every large, confirmed chapter 11 E&P case since 2015.  *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 332 (Bankr. S.D.N.Y. 2018); *see also* McManigle Report, App. C.

- Douglas A. Fordyce, the Debtors' financial advisor in this case, stated in his declaration in  *Breitburn Energy* that the use of consensus pricing for an NAV enterprise valuation is far less appropriate than utilizing Strip because (i) it is exceedingly difficult for any individual to predict future oil prices with any meaningful degree of certainty, (ii) utilizing a self-created "consensus" forecast enables the expert to cherry-pick those forecasts that support a predetermined "high" or "low" thesis, and (iii) unlike analyst or consultant forecasts, Strip reflects actual, broad market activity by investors that have access to all available data, and who then invest actual money based on that data."  *See* Decl. of Douglas

A. Fordyce in Support of Confirmation of Debtors' Third Amended Joint Chapter 11 Plan at ¶¶ 82–87 (attached as Exhibit J hereto), *Breitburn Energy*, 582 B.R. 321 (Bankr. S.D.N.Y. 2018) (Case No. 16-11390 (SMB)).

- In *EP Energy*, debtors' investment banker Evercore stated in its declaration in support of plan confirmation that NYMEX Strip pricing is the "best predictor for determining the feasibility of Debtors' plan" because it "reflects billions of dollars of futures contracts traded each trading day" and "reflects all available public data considered by active, actual market participants (i.e., physical participants such as producers, merchants, processors and end users, institutional money managers, and swap dealers) who willingly buy or sell at these price levels."  Decl. of Avinash D'Souza in Support of Confirmation at ¶ 5, *In re EP Energy Corporation* (Bankr. S.D. Tex. 2020) (Case No. 19-35654 (MI)) (attached as Exhibit K hereto).

- In *Legacy Reserves*, Judge Marvin Isgur also agreed with the debtors' use of Strip pricing as the mechanism for forecasting oil prices.  Transcript of Confirmation Hearing – Day Three at 280:7-10, *In re Legacy Reserves, Inc.* (Bankr. S.D. Tex Nov. 8, 2019) (Case No. 19-33395 (MI)) (attached as Exhibit L hereto).

In short, the Debtors' Case B projections based on Strip pricing are more reliable than their Case A projections.[12]  *See also* McManigle Report, at ¶¶ 60-65.

59.     The Debtor's Case B April 1 Projections—and, for that matter, the Case A April 1 Projections as well—estimate that 2020 EBITDA will be $30.3 million, **a 49.7% decline from the February 28 projections**. Disclosure Statement Supplement, at Ex. F; McManigle Report, at ¶ 80.  Nor are these dramatic impacts short-lived.  Indeed, under the Debtors' April 1 Projections at no point during the five-year projection period does EBITDA reach the $60.3 million that the Debtors previously predicted for 2020.  Disclosure Statement Supplement, at F; McManigle Report, at ¶ 80.  The Debtors' April 1 Projections now show a five-year cumulative EBITDA of $212.5 million—a **39.7% decline from the February 28 Projections**.  The Debtors' April 1 Projections also now show a five-year cumulative net cash flow of $40.3 million—a **52.9%**

---

[12] Accordingly, unless otherwise specified, references to the April 1 Projections refer to Case B, insofar as they are based on a measure that is widely accepted to be more reliable than the measure underlying Case A.

**decline from the February 28 Projections**. And Debtors' April 1 Projections show five-year cumulative free cash flow, which isolates effects from the inflow of debt issuance in 2020 to better understand the operational performance of the Debtors, of only $15.2 million—an **almost 70% drop compared to the February 28 Projections**. Disclosure Statement Supplement, at Ex. F; McManigle Report, at ¶ 80.

60.     In short, based on these dramatic cumulative five-year declines in EBITDA, net cash flow and free cash flow, there can be little doubt that since February 28 there have been developments that have "had or would reasonably be expected to have a material adverse effect on, and/or material adverse developments that would reasonably be expected to result in a material adverse effect with respect to . . . the business, operations, properties, assets, prospects or financial condition of the Company and its subsidiaries, in each case taken as a whole." BCA § 5(f); McManigle Report at Appendix D, p. 70; *see Akorn, Inc. v. Fresenius Kabi AG*, No. 2018-0300-JTL, 2018 WL 4719347, at *25, 54–55, 57 (Del. Ch. Oct. 1, 2018) (finding MAE based on 26% reduction in annual projected revenue and 39% reduction in annual projected EBITDA, and quarterly year-over-year reduction in revenue of between 25 and 34% and in adjusted EBITDA of 51%), *aff'd*, 198 A.3d 724 (Del. 2018); *see also id.* at *53 (discussing general threshold that a 40% reduction in profits is sufficient to demonstrate an MAE). Indeed, the severely negative financial impact forecasted by Debtors' own management for the full five-year projection period is far longer than would be necessary to qualify as an MAE, particularly in the context of a reorganization. *See In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 68 n.154 (Del. Ch. 2001) (explaining the finding of a material adverse change in *Pan Am. Corp. v. Delta Air Lines*, 175 B.R. 438, 492-93 (S.D.N.Y. 1994) on the basis that "the party relying on the MAC

clause was providing funding in a work-out situation, making [a sharp three-month] deterioration of Pan Am's already compromised condition quite important.").

61.     The Debtors therefore cannot meet their burden of demonstrating that the Plan is feasible and satisfies section 1129(a)(11).  It is blackletter law that, at a very bare minimum, demonstrating that the Plan is feasible requires the Debtors to show that "any necessary financing has been obtained, or is likely to be obtained."  7 Collier on Bankruptcy ¶ 1129.02; *see also In re Save Our Springs*, 632 F.3d at 173–74 (affirming denial of confirmation where "the evidence did not provide reasonable assurance that [debtor] could fund the plan.").  Here, the Plan expressly provides that the source of funds for the contemplated Plan distributions—such as the contemplated payment in full, in cash, at par plus accrued default interest and other costs of the Term Loan—is the contemplated rights offering and sale of new bonds.  The success of each of these transactions depends on the Objecting Noteholders agreeing to fund their shares of these transactions.  Because the Objecting Noteholders are not required to fund, and are asserting their legal rights not to do so, *see* Honarvar Declaration, Ex. D; Mercer Declaration Ex. E; Flannery Declaration, Ex. F., the Debtors cannot demonstrate that they will have the funds required to consummate the plan.  The Plan is therefore not feasible.

### C.     The Actual Circumstances Now Facing the Debtors Are Actually Far Worse Even Than the April 1 Projections Suggest, and Demonstrate Both that the MAE Provision Has Been Triggered and that the Plan Is Not Feasible Because the Debtors Are Likely to Be Back In Bankruptcy

62.     As bad as the Debtors' April 1 Projections were, the reality is unfortunately far worse.  The Debtors' February 28 Projections were accompanied by a business plan outlining critical factors and assumptions, but the April 1 Projections were not.  *See* McManigle Report at ¶ 59.  As described in detail in the McManigle Report, the already dismal April 1 Projections are actually far too optimistic.  And not only were the April 1 Projections overly optimistic as of

April 1, but circumstances have continued to deteriorate rapidly in the subsequent weeks.  Not only has the MAE provision been triggered, but current circumstances establish that even if the Plan were confirmed, it would likely be followed by the need for further financial reorganization or liquidation.  *See* McManigle Report, at ¶¶ 87-90.

### 1. The April 1 Projections Were Overly Optimistic and Unreliable as of April 1

63. The Case B April 1 Projections show an average annual drop in revenue of about 25%.  McManigle Report, at ¶ 67.  Even that steep decline is unreasonably optimistic, because the revenue, gross margin, utilization rate, and drilling rate assumptions underlying the April 1 Projections are each unreasonably optimistic.

64. During the last downturn of 2014-2016, Debtors experienced an approximately 75% drop in revenue.  McManigle Report, at ¶ 67.  With rig counts already having been reduced by one-third—with estimates of 50-60% declines for 2020—and with WTI prices and the Futures Curve being far more depressed than the previous downturn, Debtors' projected 25% annual revenue decline is unrealistic.  *Id.*

65. Debtors' gross margin assumptions are also unreasonable.  The February 28 Projections assumed an average gross margin of 26.3% for the five-year projection period, while the Case B April 1 Projections assume only a small decline in average gross margins, to 24.5%.  Given the substantial reductions in revenue, and given that the Debtors' own Disclosure Statement Supplement states that drivers of margin include rig utilization, rates and job volume, this small change in gross margin is not realistic.  *See* McManigle Report, at ¶ 70.  As evidence of this, during the 2014-2016 downturn, the Debtors' margins declined by approximately 10%, under circumstances less extreme than those existing now.  *Id.* at Table 5.

66.     The Debtors' April 1 Projections are also based on unreasonably optimistic utilization rates and average domestic drilling rates.  These unreasonable assumptions have an outsized impact on the overall projections, because the domestic drilling business is expected to contribute approximately 70% of Pioneer's pre-corporate EBITDA.  McManigle Report at ¶ 48. In their April 1 Projections, the Debtors assume a 73.4% utilization rate (down from 89.2% in their February 28 Projections).   McManigle Report, at ¶ 68.   These rates are higher than reasonable based on the Debtors' own data and third-party market estimates.  With respect to the Debtors' own data, the Debtors provided a contract status summary in due diligence materials, which shows contracts for the Debtors' drilling rigs.  *See* McManigle Report, at ¶ 75.  According to that summary, there are a number of rigs that have no contract in place for the vast majority or all of 2020 through March 2021, or a well to well contract.  This means that the Debtors cannot plan on having future work for those rigs and have no exclusivity for 2020 and beyond.  In sum, the contract status summary shows that utilization could easily be only fifty percent (50%), meaning that the Debtors would garner only half of the potential revenue they could obtain, if the well to well contracts cease.  *Id.*  Moreover, the summary discloses that the average domestic drilling rate per day for 2020 is $19,373.80—approximately 25% lower than the April 1 Projections assumption.  *Id.*  The unreasonableness of the April 1 Projections is also reflected in the fact that the projections <u>increased</u> the Debtors' 2020 drilling revenue per day assumptions by 11%.  *Id.* at ¶ 69.  The Debtors' utilization and rate assumptions are also incompatible with market estimates calling for average rig counts to continue to decline in 2020 and 2021 to 250-350 rigs vs ~790 on February 28, 2020.  *Id.* at ¶ 68 & App. G.  In a declining market, rates will decrease, not increase.  *Id.* at ¶ 69.

67.     In addition, as compared to the February 28 Projections, the April 1 Projections contain <u>more favorable</u> assumptions regarding accounts receivable and payable.  Assuming that these conditions will be more favorable when the Debtors' customers will be in severe distress is simply unreasonable.  *See* McManigle Report, at ¶ 72.  Rather than an improved picture regarding accounts receivable and payable, in light of the extreme stress facing the Debtors' customers, they will likely be extending their payment terms or else, faced with distressed situations or bankruptcy, may stop paying altogether.  *Id.*

68.     Even under the April 1 projections, the Plan is not likely to achieve one of its key objectives, which is to bolster the Debtors' ability to generate cash.  While the February 28 Projections showed that the Debtors expected to reduce net debt, the April 1 Projections show that under **both** Case A and Case B net debt builds at least through 2022.  Even in the unrealistically optimistic Case A, net debt is always greater and never returns to prior 2020 levels for all projected years.  McManigle Report, at ¶ 77.  Under Case B, it is reasonable to assume even greater levels of net debt, which demonstrates the Debtors' sensitivity to revenue reductions.  *Id.*

69.     The April 1 Projections also raise important questions about whether the Debtors' fleet will be reduced or allowed to age or become obsolete, as the Debtors' net PP&E expenditures are greatly reduced over the projection period as compared to the Debtors' historical PP&E expenditures.  This casts doubt on whether the Debtors have the necessary resources to continue to execute their projected yearly increases in revenue.  *See* McManigle Report, at ¶ 79.

**2.      The April 1 Projections Are Not Reliable In Light of Continued Severe Deterioration in the Oil and Gas Markets Since April 1**

70.      The April 1 Projections, in addition to being unrealistic and unsupportable at the time they were issued on April 1, are now effectively obsolete in light of the continued deterioration in the oil and gas markets since that date, as described above.  Even as of April 1, but all the more so now, the April 1 Projections fail to consider key realities of the oil and gas market and the impacts of the COVID-19 pandemic on the Debtors' business, including the devastation to the Debtors' customer base and the loss of market share.  Indeed, the precipitous changes of the past several weeks are evidenced by the fact that many S&P 500 companies have withdrawn existing earnings guidance—including oil giants Schlumberger and Halliburton, *see* McManigle Report, at Appendix G, p. 79—reflecting these companies' judgment that the present circumstances are too volatile to provide earnings guidance to the market.

71.      As noted above, many of the Debtors' key customers announced dramatic reductions to previously planned capital spending programs for 2020, and the news in recent days has indicated that these reductions will be even more severe going forward.  *See supra* at ¶ 53.  The steep decline in rotary rig counts will also have a strong negative impact on Pioneer, and that decline is likely to become even more pronounced going forward.  *See supra* at ¶ 52.

72.      As the McManigle Report describes based upon historical financial performance, middle market companies such as the Debtors face additional hurdles in the present adverse market conditions.  First, the Debtors will experience a more severe drop off in financial performance than larger peers such as the Big Three oilfield services companies (Schlumberger, Halliburton, and Baker Hughes).  *See* McManigle Report, at ¶ 85.  Second, even under the most optimistic projections, the Debtors have relatively less available capital than their larger peers such as the Big Three.  *Id.*  Instead, exploration and production activities and services will likely

shift to large, consolidated operators such as the Big Three, effectively destroying Pioneer's already eroding customer base. *Id.* Any reliable projections must take these market realities into consideration. The Debtors' April 1 Projections do not, which unfortunately also leads to the conclusion that a company in Pioneer's situation cannot avoid further reorganization even if the current Plan were to be confirmed. *See* McManigle Report, at ¶ 86.

73. As Mr. McManigle, an oil and gas veteran with decades of experience in the industry, has concluded:

> Considering the impacts of COVID-19, diminished rig counts, slashes to capex, reduced WTI prices that will be sustained for the Projection Period as indicated by the Futures Curve, and the Debtors', peers' and industry's track record of historical performance considering exposure to factors that have already presented themselves as outlined herein, it is my opinion that a Material Adverse Effect has occurred.

> In addition, it is my opinion, as founded herein, that the Revised Financial Projections were assembled in such a fashion that they lack the detail, depth and transparency that would demonstrate that the Debtors have adequately and responsibly installed the proper mitigants for the very real and unprecedented risks currently confronting the Debtors. Accordingly, it is my opinion that the Plan is not likely to succeed, and I believe confirmation would likely be followed by liquidation or the need for further financial reorganization of the Debtors.

McManigle Report, at ¶¶ 89-90.

74. Accordingly, even if this Court were to conclude that an MAE has not occurred, and even if the RSA and BCA transactions were consummated, the Debtors have not, and cannot, demonstrate that confirmation will not be followed by a later bankruptcy or liquidation. As explained above, feasibility is commonly evaluated against a six-factor test, under which the court considers "(1) the adequacy of the debtor's capital structure; (2) the earning power of the debtor's business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) and any other related matter which determines the prospects of a sufficiently successful operation to enable performance of

the provisions of the plan." *In re Save our Springs (S.O.S.) Alliance, Inc.*, 632 F,3d 168, 173 n.6 (5th Cir. 2011) (quoting *In re M & S Assocs., Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992)). Accordingly, where, as here, the feasibility of a plan depends on unreasonably optimistic projections about the "earning power of the debtors' business" that fly in the face of prevailing economic conditions, courts routinely conclude that such plans are not feasible and cannot be confirmed. *See, e.g.*, *In re Delta AG Grp., LLC*, 596 B.R. 186, 199 (Bankr. W.D. La. 2019) ("lack of credible evidence regarding the projected income" meant that Debtor failed to present sufficient evidence of feasibility); *In re Young Broad., Inc.*, 430 B.R. 99, 131-38 (Bankr. S.D.N.Y. 2010) (plan premised on "aggressive and unrealistic" projections was not feasible); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 508 (S.D.N.Y. 1994).

75. The Debtors have failed to demonstrate that the plan is feasible because even the Case B April 1 projections are overly optimistic and premised on unrealistic assumptions about revenues, gross margin, utilization, drilling rates, and ability to generate cash. Indeed, the shortcomings of the Debtors' projections precisely fit the shortcomings of the projections that led the U.S. Bankruptcy Court for the District of Delaware to conclude, in *In re Paragon Offshore PLC*, Chapter 11 Case No. 16-10386 (CSS), 2016 WL 6699318, at *20–25, (Bankr. D. Del. Nov. 15, 2016), that an oil and gas drilling and production company presented unreasonable, and unfeasible, projections. In *Paragon*, Judge Sontchi rested his conclusion that the Debtors' plan was not feasible on the conclusion that the Debtors' projections are "not reasonably achievable," 2016 WL 6699318 at *29, because they rested on "unrealistic assumptions as to rig utilization and day rates," *id.* at *1, and as a result, the debtors would not generate enough cash to survive under the contemplated plan. *Id.* at *29. As explained above, the Debtors' April 1 Projections suffer from the same deficiencies and more. Just as in *Paragon*, the Debtors have not met and

38

cannot meet their burden to demonstrate a "reasonable assurance" of success necessary to satisfy section 1129(a)(11).

## II.     The Disclosure Statement is Inadequate and Cannot Receive Final Approval

76.     The Plan also cannot be confirmed because the Disclosure Statement fails to provide creditors with the "adequate information" required by section 1125 of the Code.  As explained at length above and in the McManigle Report, even the April 1 Projections—which show a precipitous decline in the Debtors' business and prospects—are both unreasonably optimistic and hopelessly outdated.  Because the fundamental purpose of a disclosure statement is to allow creditors to make informed judgments about a plan, *e.g., In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988), a disclosure statement premised on unreasonable and outdated projections simply cannot satisfy section 1125.

77.     Here, the "hypothetical investor" that serves as the touchstone for adequacy of disclosure, § 1125(a)(1), cannot possibly have adequate information about the Debtors' future prospects.  Nearly every one of the relevant inputs to the Debtors' April 1 Projections have suffered additional steep declines since April 1.  For example, in explaining the basis for their projections, the Debtors stated that "expected spending in the energy industry" is "heavily influenced by the current and expected future prices of oil and natural gas," and that "[r]ig activity is an indicator of the level of spending for the exploration and production of oil and natural gas reserves."  Supplemental Disclosure Statement, at 5.  Each of these metrics have declined since April 1.  The price of oil has significantly declined, as the spread on the WTI Futures Curve between April 1 and April 21 shows a drop in the Futures Curve for 2020 of 53%.  McManigle Report at ¶ 54, Chart 21 and Table 4.  Baker Hughes reports that by April 3, rig counts had dropped 15.9% as compared to February 28.  *Id.* at ¶ 46, Chart 18.  But by April 17, that declined had doubled, as rig counts were 33% lower than on February 28.  *Id.*  Spears &

Associates also showed significant additional reductions in its average US rig count forecast:  in March it forecast an average of 687 rigs active in 2020; it reduced this forecast to 410 rigs in its April forecast, and then further reduced this to 349 rigs in a revised April forecast.  *Id.*, ¶ 68; *Id.* at Appendix G, p. 74.  This represents an almost 50% percent decline in rig count from the March forecast.  *Id.*  Given these material changes, it is simply implausible that the Debtors April 1 Projections could be accurate or adequate when key inputs have suffered additional steep declines.

78.     While the Debtors may counter that the Disclosure Statement need not be updated because Plan solicitation has already been completed, any such argument is directly contrary to this Court's "conditional approval" procedures.  In this case, the Debtors sought conditional, not final, approval for their disclosure statement, and set the disclosure statement hearing to be held together with the confirmation hearing.  As such, the Debtors assumed the risk that the conditionally approved Disclosure Statement might be found inadequate, as Bankruptcy Local Rule 3018-2 specifically preserves all objections to a conditionally-approved disclosure statement.  And where, as here, a conditionally-approved disclosure statement is not adequate, courts of this and other districts have not hesitated to deny final approval and, when necessary, require resolicitation. *E.g.*, *In re J.D. Mfg., Inc.*, No. 07-36751, 2008 WL 4533690, at *3 (Bankr. S.D. Tex. Oct. 2, 2008) (rescinding conditional approval and denying final approval of inadequate disclosure statement); *In re CHL, LLC*, No. 18-00630-5, 2018 WL 3025310, at *3–4 (Bankr. E.D.N.C. June 14, 2018) (denying final approval of conditionally-approved disclosure statement that did not contain adequate information);  *In re Sparta Surgical Corp.*, No. 06-cv-02601, 2008 WL 878948 (D. Colo. Mar. 28, 2008) (same); *In re Source Enters., Inc.*, No. 06-

11707, 2007 WL 7144778, at *4 (Bankr. S.D.N.Y. July 31, 2007) (same).   The Debtors'
Disclosure Statement thus should not be approved.

79.     The Debtors' own disclosures and publicly available industry information
establish that the April 1 Projections are inaccurate and overly optimistic, that a Material
Adverse Event has occurred, and that the Plan is not feasible. The Objecting Noteholders have
served targeted discovery requests on the Debtors to further explore the accuracy and adequacy
of the April 1 Projections, but have only recently begun to receive the first batch of the Debtors'
documents on April 21.  And on April 21, after several requests from the Objecting Noteholders,
the Debtors indicated that they would be providing updated projections next week in advance of
the confirmation hearing scheduled for May 5.  The Objecting Noteholders reserve the right to
supplement this Objection with any information learned through discovery and/or through the
Debtors' further revised projections, as well as all arguments regarding the inadequacy of such
projections and the timing of their receipt.

## CONCLUSION

80.     For all of the foregoing reasons the Debtors' Plan is not feasible and should not be
confirmed, and the Disclosure Statement should not receive final approval.

DATED:  April 24, 2020                     Respectfully submitted,
Houston, Texas

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr.                    Damian S. Schaible (admitted *pro hac vice*)
Texas State Bar No. 02016600               Natasha Tsiouris (admitted *pro hac vice*)
Martha Wyrick                              Brian Weinstein (admitted *pro hac vice*)
Texas State Bar No. 24101606               Marc Tobak (admitted *pro hac vice*)

**HAYNES AND BOONE, LLP**                   **DAVIS POLK & WARDWELL LLP**
1221 McKinney Street, Suite 2100           450 Lexington Avenue
Houston, Texas 77010                       New York, NY 10017
Telephone.: (713) 547-2000                 Telephone: (212) 450-4000
Facsimile: (713) 547-2600                  Facsimile: (212) 701-5800
Email: charles.beckham@haynesboone.com     Email: damian.schaible@davispolk.com
Email: martha.wyrick@haynesboone.com       Email: natasha.tsiouris@davispolk.com
                                           Email:  brianweinstein@davispolk.com
  -and-                                    Email:  marc.tobak@davispolk.com

Charles M. Jones, II                       ***Counsel for the Objecting Noteholder Group***
Texas State Bar No. 24054941
Aimee Furness
Texas State Bar No. 24026882

**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: (213) 651-5000
Facsimile: (214) 651-5940
Email: charlie.jones@haynesboone.com
Email: aimee.furness@haynesboone.com

***Counsel for the Objecting Noteholder Group***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served by electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on April 24, 2020.

<u>*/s/ Charles A. Beckham, Jr.*</u>
Charles A. Beckham, Jr.